No. 22-13174-HH

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MITZI BICKERS,

*Defendant-Appellant.*

On appeal from the United States District Court
for the Northern District of Georgia
No. 1:18-CR-00098-SCJ-LTW-1

## BRIEF OF APPELLEE
## THE UNITED STATES OF AMERICA

RYAN K. BUCHANAN
*United States Attorney*

JEFFREY W. DAVIS
*Assistant United States Attorney*

TIFFANY R. DILLINGHAM
*Assistant United States Attorney*

600 United States Courthouse
75 Ted Turner Drive S.W.
Atlanta, GA 30303
(404) 581-6000

No. 22-13174-HH

*United States of America v. Mitzi Bickers*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In addition to those listed in Appellant's Certificate of Interested Persons, the following people and entities have an interest in the outcome of this appeal:

Anytime Bail Bonding, Inc., Claimant

Erskine, Kurt R., former United States Attorney

Pak, Byung J., former United States Attorney

Sanders, Erin, Assistant United States Attorney

Steel, Brian, Claimant Anytime Bail Bonding, Inc. Attorney

Steel, Colette R., Claimant Anytime Bail Bonding, Inc. Attorney

Walker, Linda T., United States Magistrate Judge

Wallace, Michael B., Appellant's former Defense Counsel

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary in this case. The issues and positions of the parties, as presented in the record and briefs, are sufficient to enable the Court to reach a just determination.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure
　　Statement.................................................................C-1

Statement Regarding Oral Argument .............................................. i

Table of Contents............................................................... ii

Table of Citations .............................................................v

Statement of Jurisdiction...................................................xiv

Statement of the Issues ........................................................ 1

Statement of the Case........................................................ 3

　　A. Course of Proceedings and Disposition Below..................... 3

　　B. Statement of Facts.................................................... 4

　　　　1. Atlanta hires Bickers........................................... 4

　　　　2. Annual sidewalks contract...................................... 5

　　　　3. Bridge repair contract. ...................................... 6

　　　　4. 2011 snow emergency........................................... 7

　　　　5. Bickers's purchases and cash deposits............................ 8

　　　　6. Bickers resigns but continues the scheme...................... 10

　　　　7. Bickers admits her role. .................................... 13

　　　　8. Mitchell's cross-examination. ........................... 14

　　　　9. Cotena Alexander.......................................... 20

　　　　10. Rule 29 motion regarding wire fraud. ........................... 24

　　　　11. Sentencing hearing. .................................... 25

　　C. Standards of Review.............................................. 27

Summary of the Argument........................................................ 29

Argument and Citations of Authority ......................................... 31

1.  The district court did not abuse its discretion by precluding three narrow topics from Mitchell's cross-examination, and any error was harmless. ................................................................ 31

    A.  The district court did not abuse its discretion by excluding the three topics as improper character evidence that was irrelevant and violated Rule 403. ........................................ 31

    B.  Any error did not violate the Sixth Amendment because Bickers conducted a thorough cross-examination, and any error was harmless. ............................................................ 33

2.  The district court did not abuse its discretion by denying Bickers's motion for a curative instruction where Mitchell gave no false testimony, and any falsehoods were immaterial. ........ 35

    A.  Mitchell had a faulty memory, and any inconsistencies with the FBI file do not prove knowing falsity. ........................... 36

    B.  The alleged falsities were not material to the verdict. ........ 38

3.  The district court did not abuse its discretion by denying Bickers's motion for a mistrial based on the admission of three non-hearsay emails that were written by a potential defense witness who exercised her Fifth Amendment privilege. .......... 40

    A.  The district court did not abuse its discretion by finding that the United States did not cause Alexander's unavailability ....................................................................... 40

    B.  The district court did not abuse its discretion by admitting Alexander's emails as non-hearsay. ...................................... 41

4.  The Court should remand for the United States to seek dismissal of the wire fraud counts and resentencing. .............. 44

5.  The district court did not clearly err in applying the Sentencing Guidelines, and any purported error was harmless because the district court said that it would impose the same sentence regardless. .................................................................. 47

A.  The district court did not clearly err in calculating the bribe amount or in finding that the 2014 bribery scheme constituted relevant conduct. ............................................... 47

B.  The district court did not clearly err in finding that the bribe amount was more than $1.5 million. ....................... 50

C.  As the City of Atlanta's Director Human Services, Bickers possessed a high-level decision-making position. ............... 52

D.  Bickers had a leadership role in an otherwise extensive scheme. ................................................................. 54

E.  Any sentencing error was harmless. ................................... 57

Conclusion ..................................................................... 60

Certificate of Compliance and Service ......................................... 61

# TABLE OF CITATIONS

Federal Cases

*Ciminelli v. U.S., et al.,

    No. 21-1170, 2023 WL 3356526 (May 11, 2023) ........................... 46

Crawford v. Washington,

    541 U.S. 36 (2004) ........................................................ 42

Delaware v. Van Arsdall,

    475 U.S. 673 (1986) ...................................................... 34

Demps v. Wainwright,

    805 F.2d 1426 (11th Cir. 1986) ..................................... 40

Giglio v. U.S.,

    405 U.S. 150 (1972) ...................................................... 36

Kelly v. United States,

    140 S. Ct. 1565 (2020) .................................................. 44

Martin v. U.S.,

    949 F.3d 662 (11th Cir. 2020) ...................................... 43

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*Napue v. Illinois,*

    360 U.S. 264 (1959) ........................................................................ 36

\**Routly v. Singletary,*

    33 F.3d 1279 (11th Cir. 1994) ................................................... 36, 38

*Trepal v. Sec'y, Fla. Dept. of Corrections,*

    684 F.3d 1088 (11th Cir. 2012) ....................................................... 39

*U.S. v. Anderson,*

    1 F.4th 1244 (11th Cir. 2021) .......................................................... 28

\**U.S. v. Bailey,*

    123 F.3d 1381 (11th Cir. 1997) ................................................. 36, 38

*U.S. v. Barrington,*

    648 F.3d 1178 (11th Cir. 2011) ....................................................... 50

\**U.S. v. Burson,*

    159 F.3d 1328, 1336-37 (11th Cir. 1998) ...................................... 34

\**U.S. v. Campbell,*

    765 F.3d 1291 (11th Cir. 2014) ....................................................... 50

\**U.S. v. Clotaire,*

    963 F.3d 1288 (11th Cir. 2020) ....................................................... 31

   \*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*U.S. v. Crawford*,

    407 F.3d 1174 (11th Cir. 2005) ....................................................... 50

*U.S. v. Crutchfield*,

    26 F.3d 1098 (11th Cir. 1994) ......................................................... 32

*\*U.S. v. Esquenazi*

    752 F.3d 912 (11th Cir. 2014) .........................................................57

*U.S. v. Ettinger*,

    344 F.3d 1149 (11th Cir. 2003) ....................................................... 40

*\*U.S. v. Garcia*,

    13 F.3d 1464 (11th Cir. 1994) ......................................................... 33

*\*U.S. v. Goldman*,

    953 F.3d 1213 (11th Cir. 2020) ....................................................... 57

*U.S. v. Grushko*,

    50 F.4th 1 (11th Cir. 2022) .............................................................. 57

*\*U.S. v. Guertin*,

    4th__,2023 WL 3470862 (D.C. Cir. May 16, 2023)...................... 45

*\*U.S. v. Gupta*,

    463 F.3d 1182 (11th Cir. 2006) ....................................................... 55

    *Citations primarily relied upon. 11th Cir. R. 28-1(e).

*U.S. v. Hills*,

    27 F.4th 1155 (6th Cir. 2022)........................................................ 53

*U.S. v. Horner*,

    853 F.3d 1201 (11th Cir. 2017)................................................... 36

*U.S. v. Hunt*,

    459 F.3d 1180 (11th Cir. 2006)................................................... 58

\*U.S. v. Jiminez*,

    564 F.3d 1280 (11th Cir. 2009)................................................... 42

*U.S. v. Keene*,

    470 F.3d 1347 (11th Cir. 2006)................................................... 28

*U.S. v. Lankford*,

    955 F.2d 1545 (11th Cir. 1992)................................................... 27

\*U.S. v. Maddox*,

    803 F.3d 1215 (11th Cir. 2015)................................................... 47

*U.S. v. Maher*,

    955 F.3d 880 (11th Cir. 2020)..................................................... 28

*U.S. v. Martinez*,

    964 F.3d 1329 (11th Cir. 2020)................................................... 28

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*U.S. v. Maxwell,

    579 F.3d 1282 (11th Cir. 2009) ........................................................ 31

U.S. v. Michael,

    17 F.3d 1383 (11th Cir. 1994) ......................................................... 37

U.S. v. Newsome,

    475 F.3d 1221 (11th Cir. 2007) .................................................. 40, 43

U.S. v. Orton,

    76 F.3d 331 (11th Cir. 1996) ........................................................... 51

*U.S. v. Perry,

    14 F.4th 1253 (11th Cir. 2021) ....................................................... 43

U.S. v. Rivera,

    780 F.3d 1084 (11th Cir. 2015) ...................................................... 42

U.S. v. Rushin,

    844 F.3d 933 (11th Cir. 2016) ........................................................ 27

*U.S. v. Serrano,

    406 F.3d 1208 (10th Cir. 2005) .................................................. 40, 41

U.S. v. Siegelman,

    786 F.3d 1322 (11th Cir. 2015) .................................................. 49, 50

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*U.S. v. Slaughter,

298 F. App'x 876 (11th Cir. 2008) ..................................................... 55

*U.S. v. Smith,

429 F. App'x 840 (11th Cir. 2011) ..................................................... 54

U.S. v. Smith,

No. 1:17-CR-00020, 2022 WL 2103063 (D. Guam June 3, 2022)

.................................................................................................. 45, 46

U.S. v. Stein,

846 F.3d 1135 (11th Cir. 2017) ....................................................... 37

U.S. v. Tao,

No. 19-20052-JAR, 2022 WL 4355302 (D. Kan. Sept. 20, 2022) . 45

U.S. v. Taylor,

417 F.3d 1176 (11th Cir. 2005) ....................................................... 32

U.S. v. Valarezo-Orobio,

635 F.3d 1261 (11th Cir. 2011) ....................................................... 47

*U.S. v. Valnor,

451 F.3d 744 (11th Cir. 2006) ......................................................... 58

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*U.S. v. Whitman,

 887 F.3d 1240 (11th Cir. 2018) ................................................... 50, 52

U.S. v. Wilson,

 149 F.3d 1298 (11th Cir. 1998) ....................................................... 40

U.S. v. Wright,

 392 F.3d 1269 (11th Cir. 2004) ....................................................... 28

U.S. v. Yates,

 16 F.4th 256 (9th Cir. 2021) ........................................................... 45

Ventura v. Attorney General, Fla.,

 419 F.3d 1269 (11th Cir. 2005) ....................................................... 38


Federal Statutes

18 U.S.C. § 1512(b)(3) ........................................................................ 3

18 U.S.C. § 1957 ................................................................................. 3

18 U.S.C. § 3231 ............................................................................... xi

18 U.S.C. § 3742 ............................................................................... xi

18 U.S.C. § 1343 .......................................................................... 3, 44

18 U.S.C. § 1349 ................................................................................. 3

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

26 U.S.C. § 7206 .......................................................................... 3

28 U.S.C. § 1291 ..........................................................................xi

U.S.C. § 371 ................................................................................ 3

U.S.C. § 666(a)(2) ....................................................................... 3

Federal Rules

FED. R. APP. P. 4(b)(1)(A) ...........................................................xi

FED. R. APP. P. 32(a)(5) .............................................................. 61

FED. R. APP. P. 32(a)(6) .............................................................. 61

FED. R. APP. P. 32(a)(7)(B) ........................................................ 61

FED. R. APP. P. 32(f) ................................................................... 61

FED. R. EVID. 801(d)(2)(E) ......................................................... 43

Sentencing Guidelines

U.S.S.G. § 1B1.3.................................................................... 47, 48

U.S.S.G. § 1B1.3(a)(1), (2)......................................................... 48

U.S.S.G. § 2C1.1 .................................................................. 53, 54

U.S.S.G. § 2C1.1(b)(3) ............................................................... 53

U.S.S.G. § 3B1.1........................................................................ 55

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

U.S.S.G. § 3B1.1(b) ............................................................................ 54

U.S.S.G. § 3B1.3 ................................................................................ 53

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

No. 22-13174-HH

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MITZI BICKERS,

*Defendant-Appellant.*

## STATEMENT OF JURISDICTION

(A)  The district court had subject matter jurisdiction over the underlying criminal case based on 18 U.S.C. § 3231.

(B)  The Court of Appeals has jurisdiction over this direct appeal from the judgment and sentence of the district court, under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

(C)  While not jurisdictional, the notice of appeal was timely filed on September 14, 2022, within 14 days of the entry of the district court's judgment and commitment order, on September 9, 2022. FED. R. APP. P. 4(b)(1)(A).

(D)  This appeal is from a final judgment and commitment order that disposes of all the parties' claims in this criminal case.

## STATEMENT OF THE ISSUES

1.  Did the district court abuse its discretion by precluding cross-
    examination as to a settled civil lawsuit, allegations raised in
    Mitchell's divorce, and baseless questions about whether
    Mitchell was paid by the FBI, and, regardless, was the exclusion
    harmless considering the expansive cross-examination on topics
    that challenged Mitchell's credibility and bias and the other
    evidence in the case?

2.  Where Mitchell did not remember certain specifics of his prior
    cooperation with the FBI, did the district court abuse its
    discretion in denying Bickers's motion for a curative instruction
    as to his testimony?

3.  Did the district court abuse its discretion by denying Bickers's
    motion for a mistrial based on three emails that were admitted
    as non-hearsay, especially when the government did not make
    the emails' author unavailable to testify?

4.  Should the Court remand for resentencing where, in light of
    recently developed law, the government intends to move to
    dismiss the four wire fraud counts?

1

5. Did the district court clearly err in determining loss amount, in finding that Bickers was a high-level decision-maker, or was a manager or supervisor of an otherwise extensive criminal scheme, and was any Sentencing Guidelines error harmless given that the district court confirmed that it would have imposed the same sentence regardless of its Sentencing Guidelines rulings?

## STATEMENT OF THE CASE

### A. Course of Proceedings and Disposition Below

Mitzi Bickers was charged in a superseding indictment with: conspiratorial bribery under 18 U.S.C. § 371 (Counts 1-2); substantive bribery under 18 U.S.C. § 666(a)(2) (Count 3); money laundering under 18 U.S.C. § 1957 (Counts 4-6); wire fraud under 18 U.S.C. §§ 1343 and 1349 (Counts 7-10); tampering with an informant under 18 U.S.C. § 1512(b)(3) (Count 11); and filing a false tax return under 26 U.S.C. § 7206 (Count 12). (Doc. 41). A jury convicted her of conspiratorial bribery, three counts of money laundering, four counts of wire fraud, and filing a false tax return. (Doc. 213 (Counts 1, 4-10, 12)). Bickers was sentenced to 60 months' incarceration as to Count 1, 120 months as to each of Counts 4-6, 168 months as to Counts 7-10, and 36 months as to Count 12, with all prison terms to run concurrently, for a total of 168 months' imprisonment, 3 years of supervised release on each count to run concurrently, a $900 special assessment, and $2,955,106.51 in restitution. (Docs. 228-29).

Bickers timely appealed and is currently incarcerated. (Doc. 230); *see* www.bop.gov (last visited May 1, 2023).

### B. Statement of Facts

Over eight trial days, the government presented 38 witnesses and hundreds of exhibits that proved the following:

### 1. Atlanta hires Bickers.

Bickers was an Atlanta pastor and political consultant who, in 2009, assisted in Kasim Reed's election as Atlanta's mayor. (Docs. 242-43; 245-122-24). Reed appointed Bickers in early 2010 to his executive cabinet as the Director of Human Services, a department responsible for social services like food and homelessness. (Docs. 240-80-82; 241-205; 243-95-96). Bickers reported directly to the mayor's office, received $62,500 annually, and was required to complete financial disclosure forms of any income received from people or businesses doing business with Atlanta. (Docs. 240-93-99, 113; 241-205). The disclosures were important, so Atlanta trained all employees on their ethical obligations and made the disclosures public to maintain accountability, promote transparency, and prevent conflicts of interest. (Doc. 240-89-90, 97-98).

From 2010-2013, Bickers swore under penalty of perjury on several disclosure forms that she did not receive outside income from any person or business that conducted business with Atlanta. (*Id.* at100-06; Gov't Ex. 51). But each time, she had received substantial bribes from two city construction contractors, E.R. Mitchell, Jr. and C.P.

Richards, Jr. (Doc. 241-184-85). Two high-level City supervisors confirmed that such substantial non-disclosures would have resulted in termination. (*Id.* at183-86; 243-98). After her false disclosures, Bickers received four direct deposits across state lines of her Atlanta salary into her bank accounts in 2013. (Doc. 243-87-92).

### 2. Annual sidewalks contract.

Atlanta had a longstanding annual contract for sidewalk repairs that could be amended once it was awarded. (Doc. 240-164-65, 177-78; Gov't Ex. 41). Bickers, who had been friends with Mitchell for years, approached him about the sidewalks contract and told him that if he paid her $100,000 upfront, she could get him the work. (Doc. 244-90-92). She also told Mitchell that once he got the work, he would have to pay her a 7.5% kickback of money paid by Atlanta. (*Id.* at 92).

Mitchell did not have the $100,000, so he went to his longtime friend, Richards, for help. (*Id.* at 93-94). Richards knew the $100,000 was bribe money for city officials, but he gave Mitchell the money via check, and Mitchell converted it to cash to give to Bickers. (Docs. 240-168-70, 176-77; 244-93-94, 96). Bickers provided Mitchell with inside City of Atlanta information, like when sidewalk amendments for more work were coming and when they would be paid. (Docs. 240-178, 184-85; 244-103, 108-10, 116). Although the bid Mitchell and

Richards submitted was one of the highest, they got the contract anyway. (Docs. 240-169; 244-99-100).

Between 2010-2015, Atlanta paid approximately $5 million to Richards for the sidewalk work. (Doc. 240-177-78). Mitchell did virtually no work, but Richards paid him between 15-20% of the money earned from the Atlanta sidewalks contracts. (*Id.* at172-74; 244-100-01). In turn, Mitchell paid Bickers her 7.5% kickback. (Doc. 244-101-02, 111-16).

### 3. Bridge repair contract.

In Fall 2010, Bickers told Mitchell about an emergency bridge repair contract for several Atlanta bridges. (Docs. 240-185-86; 244-117). Bickers told Mitchell that he and Richards would not have to be the low bidder to get the work, and she gave Mitchell a draft copy of the City's engineer estimate. (Docs. 240-186; 244-119, Gov't Ex. 199) The estimate identified each bridge needing repair, described the problems with each, and listed the scope of repairs–this document was not public, and it gave Mitchell and Richards a considerable advantage in crafting their bid. (Docs. 241-4-7; 244-119-22, 126-27; Gov't Ex. 199). Bickers required another $100,000 payment, which Mitchell obtained from Richards and converted to cash. (Doc. 244-117-19, 127-34).

Richards started working on the bid and preparing estimates in December 2010, four months before the City announced the projects to other contractors. (Doc. 241-9-11, 16-17; Gov't Ex. 69). Richards and Mitchell were able to visit each site and prepare multiple estimates, while other contractors only had 10 days to prepare their bids. (Doc. 241-11-12, 14-17). Bickers provided inside information about the City's budget for the bridges, encouraging Mitchell and Richards to inflate their bids to maximize the profits. (*Id.* at 15-16, 31). Richards inflated his bids by $100,000 to cover Mitchell's cut, and Mitchell converted a portion of that to cash for Bickers. (*Id.* at 15, 20; 244-134). Richards was awarded work for two bridges for approximately $750,000, and he later received over $1.2 million for additional work orders based on information Bickers provided about the City's price tolerance. (Doc. 241-22-25, 34). Richards estimated that the overall profit margin for the bridge repair projects was 50-60%. (*Id.* at 34).

### 4.  2011 snow emergency.

During a January 2011 snowstorm, Atlanta rushed to find contractors to clean up snow and debris, and Bickers told Mitchell to expect a call from the City. (Docs. 243-100-02; 244-136). After Mitchell and Bickers met with a city project manager, Bickers demanded 15% of the contract money. (Doc. 244-136-37, 144).

Mitchell obtained the contract and hired Richards as a subcontractor. (Doc. 241-35-36). To cover Bickers's kickback, Mitchell and Richards falsely inflated their costs. (*Id.*; 244-144). Atlanta paid Mitchell and Richards more than $1.2 million for the 2011 snow clean up–an amount that prompted complaints from two City commissioners. (Docs. 241-35; 243-104; 244-144-46, 150-51). Despite his high prices and complaints from City officials, Mitchell was paid in full. (Doc. 244-152). Once Mitchell was paid, he wrote checks from his company account to himself, cashed the checks, and gave the cash to Bickers. (*Id.* at153-57). Bickers told Mitchell that she spread the money around the City. (Docs. 241-169; 244-158, 161).

5. **Bickers's purchases and cash deposits.**

While employed by Atlanta, Bickers insisted that Mitchell pay his bribes in cash to avoid taxes. (Doc. 244-96, 99, 134). Two former girlfriends who dated Bickers during her City employment, Diedra Verdier and Shedreka Poole, recalled that Bickers kept large amounts of cash, gave them cash, insisted that they not make any deposits over $10,000 to avoid IRS reporting, and asked them to incorporate companies. (Docs. 241-133-158; 242-38-63).

In 2010, Bickers asked Poole to open a joint bank account. (Doc. 242-44-46). Poole confirmed that several large deposits into the account—including a $32,000 check from Mitchell's company–were

not hers, and the money was withdrawn almost immediately, without her knowledge. (*Id.* at 46-52). Bickers and Poole incorporated a company called Chateau Land, and Bickers opened a secret bank account for the company without Poole's knowledge. (*Id.* at 52-55, 59-61). Large deposits and quick withdrawals also occurred without Poole's knowledge in the Chateau Land account. (*Id.* at 61-63).

Verdier recalled living "a lavish lifestyle" with Bickers purchasing first-class flights to Las Vegas and giving her large amounts of cash to spend. (Doc. 241-142-45, 164). Like with Poole, Bickers asked Verdier to open a company and a joint bank account. (*Id.* at 145-48). Mitchell once visited Bickers's house and delivered an "old fashioned doctor's bag" full of $100 bills in bank bands. (*Id.* at 150-52; 244-99). Verdier heard Mitchell and Bickers discussing that the money in the doctor's bag was for paying people and heard them discuss bidding on projects around Atlanta. (*Id.* at 153-56).

In June 2011, Bickers purchased her lake house for $775,000 almost entirely in cash. (Doc. 242-14-22). After paying $208,000 in cash in February, Bickers wired $299,000 at the June closing, including $53,000 directly from Richards. (Docs. 240-179-81; 242-16-21). Bickers paid the remaining $251,000 with a combination of cash, $9500 cashier's checks, wires, and checks drawn from a third girlfriend's company account. (Doc. 242-22-32).

Financial analysis of bank records showed that Mitchell and Richards' companies received approximately $18 million from Atlanta between 2010 and 2015. (Doc. 242-71-72). During Bickers's employment, when Atlanta paid Richards or Mitchell, Mitchell would withdraw cash, and, shortly after, cash deposits were made into Bickers's accounts. (*Id.* at 77-104). For example:

- In 2010, Atlanta paid Mitchell a total of $576,190, he withdrew $136,800 in cash, and $113,008 in cash was deposited into Bickers's accounts, usually in $10,000 increments. (*Id.* at 80-81, 86-87).

- In 2011, Atlanta paid Richards and Mitchell approximately $3.7 million, Mitchell withdrew $1.4 million in cash, and Bickers's cash deposits totaled $507,000. (*Id.* at 103). Bickers separately deposited another $208,000 in cash into another account for the house purchase. (*Id.* at 92, 97).

- After he was paid for the 2011 snow contract, Mitchell withdrew approximately $390,000 in cash, and 15 cash deposits totaling $93,400 were made into eight different Bickers accounts. (*Id.* at 84-87).

- Similarly, around the June 2011 closing date, Mitchell and Richards withdrew over $200,000, and $262,800 was deposited into Bickers's accounts in $9500 increments. (*Id.* at 98-101).

### 6. Bickers resigns but continues the scheme.

In May 2013, Bickers left her City job. (Doc. 240-82). When Bickers worked for Atlanta, virtually all cash Mitchell withdrew went to Bickers. (Doc. 244-134). When she no longer worked there,

Mitchell told Bickers he felt like a drug dealer walking around with so much cash, so he insisted she accept his bribes in checks, wires, or teller transactions. (Doc. 245-19-20).

Recognizing it was unprepared for the 2011 snowstorm, Atlanta requested proposals for an on-call snow and debris removal contract in 2012. (Doc. 243-105-07; Gov't Ex. 43). The contract provided the City a list of contractors with the necessary equipment and manpower, and whose rates could not be inflated to exploit emergencies. (Doc. 243-105-08). Mitchell was not selected as one of five pre-approved contractors. (Docs. 242-126-27; 243-108, 111-12).

In January 2014, snow hit Atlanta again, and the City should have called the on-call contractors to respond. (Doc. 243-113-16). Bickers told Mitchell to expect a call from Cotena Alexander, Operations Manager of the City's Public Works Department. (Docs. 242-130; 244-159-60). Alexander was one of the people Bickers said she paid bribes, and Mitchell had emailed with Alexander during the 2011 snow. (Doc. 244-160-61). Alexander did call, Mitchell got the work, and Bickers demanded 18% of the money he was paid. (*Id.* at 162). Mitchell sent his inflated pricing to Alexander and forwarded his emails with Alexander directly to Bickers. (*Id.* at 164-67). Bickers required Mitchell to keep her involved, so he forwarded his emails to her, blind copied her on emails, and spoke with her on the phone

11

"probably daily." (*Id.* at 188-89). Bickers made hundreds of calls to Alexander over the course of the snow emergency, and City officials knew to call Bickers if they wanted to reach Mitchell. (Docs. 242-156; 247-14-15).

In response to her supervisor's request, Alexander claimed that two pre-approved contractors were non-responsive, and another—a company in the business of responding in bad weather—"could not assist because of the weather." (Docs. 243-19-20; 247-29-32; Gov't Ex. 91). All three pre-approved contractors were in fact ready and able to perform. (Docs. 242-233; 243-23-28, 48-49). As a result, Mitchell obtained work at prices approximately 38% higher than pre-approved contractors and was paid approximately $5.5 million for 2014 snow and ice cleanup, millions more than anyone else. (Docs. 242-190-91; 247-23-29, 61). After the City paid Mitchell, Bickers wrote instructions and went to the bank with Mitchell to deposit $200,000 into her accounts. (Docs. 244-49-62; 245-25-28; Gov't Ex. 154).

In 2014, Richards and Mitchell were paid $8.3 million from the City from sidewalks and snow work. (Doc. 247-59-60). Bickers made cash deposits totaling more than $489,000, and Mitchell also made more than $1.5 million in direct payments to Bickers via wire, check, or teller transactions. (*Id.* at 71-72). Richards paid a $15,000 bribe to a company associated with Bickers, and Bickers never worked for him.

12

(Doc. 241-41-42; 247-75). Bickers's purchases in 2014 corresponded with payments from Mitchell:

- On May 5 and 9, Bickers deposited three checks from Mitchell totaling $87,700. On May 9, Bickers purchased a new 2014 Denali outright for $46,582.40. (Doc. 243-141; 247-76; Gov't Ex. 202).

- On May 23, Bickers deposited a check from Mitchell of $21,000. The same day, she purchased two jet skis for $21,091.88. (Doc. 247-77-78).

- On June 30 and July 3, Bickers deposited two checks from Mitchell totaling $22,090. On July 3, Bickers purchased two more jet skis for $24,760. (Docs. 243-142-44; 247-79-80; Gov't Ex. 202).

During 2014, Alexander's MoneyGram transactions and bank accounts showed that, after the City paid Mitchell for snow cleanup, she went to several MoneyGram locations around Atlanta to purchase $12,900 in MoneyGrams with cash. (Doc. 247-52-58, 67). Alexander did not report the cash to the City. (*Id.* at 58).

### 7. Bickers admits her role.

In 2015, Bickers joined a bid for a lucrative government contract in Jackson, Mississippi. (Doc. 246-22-25, Gov't Ex. 45). As part of that bid, she submitted her résumé. (Doc. 240-71-72, Gov't Ex. 45). Under her project experience, Bickers stated she was "[r]esponsible for annual sidewalk repairs and maintenance," "[r]esponsible for work

hauling aggregate, clearing and sweeping streets and highways of snow and ice," and "[r]esponsible for homeless services in the City of Atlanta." (Doc. 247-42-44, Gov't Ex. 218I). Bickers later produced the résumé as a business record of her company, The Bickers Group. (Doc. 247-42). That company was used to purchase her home, jet skis, Denali, and to accept bribe payments from Mitchell. (Docs. 241-200; 243-142, 222; 244-67).

### 8. Mitchell's cross-examination.

In 2006, the FBI investigated Mitchell for corruption related to Fulton County Schools, and he agreed to cooperate with the FBI. (Doc. 245-42, 97-98). The related FBI cooperation file was approximately 250 pages and was produced to the defense three months before trial. (Docs. 192 (Sealed); 241-217). According to the file:

- Mitchell's "last documented reporting and contact date occurred on 9/12/2007." (Doc. 192-4 (Ex. 3B at 35)).

- The FBI filed reports through 2012 that contained a checklist of agent "admonishments." (Doc. 192).

- Reports stated Mitchell did not engage in Otherwise Illegal Activity from July 2007 to December 2012, was not involved in undercover operations after 2009, and had zero utility value as a cooperator after 2009. (*Id.* at 5; Exs. 3A and 4).

14

- The FBI and an AUSA discussed paying Mitchell up to $50,000, but he was paid a total of $0. (*Id.* at 3; Ex. 1 at 31-32; Ex. 3A at 4, 11, 17, 23).

- An FBI memo authorized Mitchell to "meet with public officials . . . to obtain business contracts and other favorable treatment for bribe payments." (*Id.* at 3 (Ex. 1 at 21)).

Before trial, the government moved to exclude evidence of Mitchell's prior misconduct that was more than 10 years old. (Doc. 95). Before Mitchell's testimony, Bickers argued that—as to Mitchell's prior misconduct—she should be permitted to cross him broadly on (1) his 2006 cooperation with the FBI and non-prosecution agreement, (2) his 2006 dealings with Fulton County Schools, (3) his "moving money around" and opening accounts and businesses in his wife's name, and (4) various civil cases involving Mitchell. (Doc. 241-209-29). The government responded under seal attaching the FBI cooperation file. (Doc. 192).

As to the specific topics raised by Bickers, the district court permitted cross-examination on:

- whether Mitchell's cooperated with the FBI starting in 2006;

- how long Mitchell cooperated;

- whether Mitchell ever wore a recording device or had a wiretap on his phone;

- whether he owed Bickers money;

15

- whether he discussed his cooperation with Bickers;

- any prior civil litigation where Mitchell was found liable for cheating, embezzling, or fraud, or where Mitchell admitted to an untruthful act;

- whether Mitchell entered a non-prosecution agreement with the U.S. Attorney's Office; and

- whether he was debarred from participating in government work.

(Docs. 193; 244-73). The district court precluded questioning on three topics:

- FBI payments to Mitchell, because there was no good faith basis to assert Mitchell was paid to cooperate, and there was "relatively little probative value" in such questions, so the questions were barred under Rule 403. (Doc. 193).

- A dismissed civil suit against DeKalb County Schools, which accused Mitchell of fraud, because it was improper character evidence under Rule 404(a). And because there was no finding or admission that Mitchell engaged in an untruthful act, the case "could not be used to probe [his] truthfulness." (*Id.*)

- Allegations from Mitchell's divorce because "moving money" was not inherently untruthful under Rule 608, was not a pertinent trait under Rule 404, and was not relevant under Rule 402. (*Id.*)

Bickers cross-examined Mitchell for several hours on each of the eight topics of prior misconduct. (Doc. 245-84-192, 200-01). Bickers's cross also included other topics, like:

16

- his betrayal of his long-time friend, Richards, by recording his conversation for the FBI (Doc. 245-138-39, 141-42);

- his receiving a sentence reduction for his cooperation against Bickers (*Id.* at 71);

- his only being charged with one count of conspiracy, a charge with a five-year maximum sentence (*Id.* at 71);

- his meeting with the government 16 times before trial (*Id.* at 93-94);

- his being a Harvard Business School graduate while Bickers was not (*Id.* at 112, 151);

- his listing his wife as an officer in his construction business even though she was not involved in the business (*Id.* at 111-12); and

- his starting a new business after his dealings with Fulton County because his name was tarnished (*Id.* at 109-10).

But the bulk of Mitchell's cross was spent on his FBI cooperation. When asked on cross-examination whether he remembered that "[his] goal . . . was to create bribery cases in the public sector," Mitchell responded, "I do not remember that was my goal." (Doc. 245-100-01). Mitchell stated three more times that he did not remember, before explaining, "The problem is, I have not read or reviewed this agreement in years. So I'm sorry, I don't remember the details." (*Id.* at 101). Bickers again asked Mitchell if he "taped people when [he was] doing bribery cases for the government," and Mitchell clarified that his understanding was that he was not "doing bribery cases," that he

17

"was never charged or told that [he] was working with bribery individuals," and stated it was "absolutely false and made up" that he was trained "for bribery cases." (*Id.* at 140).

Bickers asked if Mitchell remembered the FBI giving him "instructions on how to be an ethical cooperator," and Mitchell responded that he did not remember. (*Id.* at 102). When counsel asked if Mitchell remembered that, during his cooperation, he could "break the law, as long as you broke the law working with them to create bribery cases," Mitchell again responded "No, that wasn't my understanding." (*Id.* at 102-03). When Bickers asked, "do you remember that every three months [the FBI] would review with you, okay, the responsibilities and obligations you had as a cooperator?" Mitchell responded, "That did not happen." (*Id.* at 103).

The next day of trial, Bickers argued that Mitchell gave false testimony on three topics that the government failed to correct: (1) whether he was tasked with bribing officials; (2) whether he received continued admonishments; and (3) whether he was still cooperating in 2012. (Doc. 246-4-7). Bickers argued that Mitchell's testimony "cannot go uncorrected," but made no specific request for relief. (*Id.* at 4). The government responded that Bickers mischaracterized Mitchell's testimony, and that the FBI file stated Mitchell's cooperation ended in 2007. (*Id.* at 7-10).

The district court interpreted Bickers's argument to seek a curative instruction, reviewed Mitchell's testimony transcript and the FBI file, and declined to give a curative instruction because (1) Mitchell's testimony "concerns faulty memory, not willful intent to provide false testimony;" and (2) the government did not "knowingly allow [Mitchell] to give false testimony" because the FBI file was "unclear as to the exact end date of [his] cooperation." (Doc. 200). The court also concluded that the alleged false testimony was not material because, given the rest of his testimony, "the jury can reasonably infer that [he] agreed to testify to receive a reduced sentence and avoid additional jail time." (*Id.*)

During closing argument, Bickers argued that Mitchell was "basically designated as kind of an auxiliary investigator to be involved in bribery activity," and described Mitchell's recording Richards as "some James Bond stuff. Sitting down, lulling him in, and then going in for the kill." (Doc. 248-60, 62, 70). Bickers argued that Mitchell lied about whether he was still working with the FBI in 2012:

- "You saw the battle. You saw me going after him, that you were doing this till the end of 2012. [...] Him saying, because he needed to, it ended before then." (*Id.* at 75);

- "If you think that through 2012, [...] if you think that E.R. Mitchell was still in a relationship with the United States of America and, therefore, there just can't be a crime, that question should have been resolved by the government." (*Id.*).

Counsel also urged the jury that Mitchell was a liar who should not be trusted:

- "what a liar. Honestly, what a piece of dirt he was," (*Id.* at 69);

- "I mean, quite candidly, how could you even believe, after he said that, one thing that ever came out of his mouth?" (*Id.*);

- "I mean, honestly, the guy is just the dirt on the bottom of your shoes." (*Id.* at 70);

- "You know, you—if you reject E.R. Mitchell, half the indictment is gone." (*Id.* at 73);

- "If you believe that E.R. Mitchell is not worthy of belief, if you believe that he is a liar, if you believe that you can give him no credibility at all. . . then you cannot find Pastor Mitzi Bickers guilty of Counts 1, 2, 4, 5, 6, or 11." (*Id.* at 77).

### 9. Cotena Alexander.

Before trial, Bickers subpoenaed Cotena Alexander to testify. (Docs. 243-3-4, 7; 244-148-49). At the time, Alexander's attorney, David Jones, believed that the government, and not Bickers, had

20

issued the subpoena.[1] (Docs. 242-177-78; 243-7; 244-213). Consequently, the day before jury selection began, Jones advised the government that Alexander intended to exercise her Fifth Amendment privileges if called to testify. (Docs. 242-176-77; 243-8-10). During the call, the government advised Jones that it had not subpoenaed Alexander. (Doc. 244-213).

According to defense counsel, during jury selection, Alexander attended court without Jones and told defense counsel that she "would be happy to be placed on call," leaving Bickers with the "impression" that Alexander was "available to testify" as a defense witness. (Doc. 243-4; 244-148). The next day, during its opening statement, the government said that in 2014, Bickers bribed Alexander to select Mitchell's company to handle more than $5.5 million worth of emergency snow removal work. (Doc. 240-23-26).

At trial, another Public Works employee, Rita Braswell, testified. (Doc. 242-113-221). During Braswell's testimony, the government offered three emails primarily written by Alexander. (*Id.* at 158-69; Gov't Exs. 100-01, 103). Exhibit 100 was an email written by Alexander to Braswell explaining the City would need more salt. (Doc. 242-158-59). Bickers objected to the email's admission, arguing that

---

[1] The Alexander subpoena did not list defense counsel's name or contact information. (Docs. 243-7-8, 10-11,110; 244-213).

the "email is pure hearsay." (*Id.* at 159). The district court admitted the email so Braswell could "explain her actions based on" receiving the email. (*Id.* at 159). After the email's admission, Braswell testified that the City contacted a vendor regarding the delivery of additional salt. (*Id.* at 160).

Exhibits 101 and 103 were emails written by Alexander to a contractor, copying Braswell, where Alexander ordered 500 tons of salt and later amended that order to 300 tons. (*Id.* at 161-62). Bickers objected that both emails were hearsay. (*Id.* at 162-69). The government responded that the emails were orders, there was no truth to be offered with orders for services, and the emails were being offered for the effect on the individuals receiving the emails. (*Id.* at 161-63, 165, 168-69). The district court admitted both emails. (*Id.* at 163, 169).

During Braswell's testimony, Bickers repeatedly claimed that "the government is more than welcome to subpoena" Alexander "and put [her] on the stand to testify." (*Id.* at 159-169). Outside the jury's presence, the government responded that according to Jones, Alexander was not available as a witness because she intended to invoke her Fifth Amendment privileges. (*Id.* at 177-78). Defense counsel replied that he had never spoken with Jones and was unaware

22

that Alexander intended to assert her rights against self-incrimination. (*Id.* at 177-78; 243-3).

The following morning, Bickers moved for a mistrial. (Doc. 243-3). Bickers claimed that Alexander was available to the defense as a witness, but when the government "cast aspersions" on Alexander in its opening, it caused her to invoke her Fifth Amendment protections and become unavailable as a witness. (*Id.* at 3-5). Bickers complained that the government's opening statement had "scared off" Alexander from testifying and that the admission of emails written by Alexander created a "confrontation [clause] issue." (*Id.* at 4-6, 10). According to Bickers, she was now in a "bind," where the government could "make all sorts of allegations against Ms. Alexander," but Bickers was "unable to rebut them," cross-examine Alexander, or call Alexander directly. (*Id.* at 5).

The government responded that Jones stated that Alexander planned to assert her Fifth Amendment protections *before* opening statements and that there was "no basis in fact or in truth" that the government designed its opening statement to keep Alexander from testifying. (*Id.* at 10). The government also noted that it was common for a co-conspirator or other witness to assert their Fifth Amendment protections and be unavailable to a party as a trial witness. (*Id.* at 9). The district court denied Bickers's motion for a mistrial, ruling that:

23

(a) the government did not cause Alexander's unavailability, and

(b) the Alexander emails were non-testimonial and were admitted for

non-hearsay purposes. (Doc. 194-7-8).

To further clarify the Fifth Amendment issue, the district court conducted a colloquy with Jones, where Jones stated that: (a) he had represented Alexander for approximately 3 years; (b) based on his advice, Alexander always intended to exercise her Fifth Amendment privileges; (c) his advice to Alexander has never changed during the course of the representation; (d) Alexander received a trial subpoena; (e) Jones called the government about the subpoena because he believed that it had been issued by the United States; and (f) before the trial started, Jones told the government that Alexander intended to invoke her privileges against self-incrimination. (Doc. 244-205-07, 209-11, 213-17). Based on Jones's representations, the district court ruled that Alexander did not need to appear in court simply to invoke her Fifth Amendment protections. (*Id*. at 209, 218).

### 10. Rule 29 motion regarding wire fraud.

At the close of the government's case, Bickers moved for judgment of acquittal on all counts. (Doc. 247-110). As to the four wire fraud counts, Bickers argued that "receipt of a salary payment, unrelated to some kind of fraud . . . could [never] be sufficient for a count of wire fraud," and the government did not prove that her lies caused her to

24

receive her salary. (*Id.* at 117-19). In response, the government argued that Bickers's "lies on her financial disclosure form divest[ed] the City of the opportunity to fire her," and relied on its prior briefing. (*Id.* at 126; *see* Doc. 64). The district court denied the motion. (Doc. 247-130).

### 11. Sentencing hearing.

Before sentencing, Bickers objected to the following in the Pre-Sentence Report ("PSR"): (a) a 16-level enhancement for the total value of the payment or benefit received from the bribes; (b) a 4-level enhancement for a high-level decision-making or sensitive position; (c) a 3-level enhancement for her leadership role; and (4) the grouping of the bribery and money laundering offenses. (PSR at 42-43.)

To establish the loss amount, the government relied on trial testimony and evidence, and financial analyses showing both indirect and direct payments from Mitchell in 2014. (Doc. 226; 252-45-47; Gov't Ex. 202). The government also argued that trial evidence showing that Bickers was the director of an executive department reporting only to the mayor was sufficient to establish a high-level position, and there was also evidence that Bickers influenced the contract award process for Mitchell and Richards. (Docs. 226; 252-14-17). As to leadership, the government pointed to the trial evidence of the overall scheme; contacts between Bickers, Mitchell, Alexander,

25

and Braswell; and Bickers's admissions about her role. (Docs. 226; 252-25-33).

Regarding loss, Bickers argued that "the bulk of the loss amount" was derived from acquitted conduct, and the government had not shown the payments in 2014 were all bribes. (Doc. 252-4-8, 43-49). Bickers also argued that the trial evidence was insufficient to show Bickers's director position was a high-level position but conceded that she made decisions for the Human Services Department. (*Id.* at 11). Bickers argued Mitchell was the true manager of the bribery conspiracy who communicated directly with city employees. (*Id.* at 19-25).

After argument, the district court overruled Bickers's Sentencing Guidelines objections. The district court determined the total offense level was 40, and the criminal history category was I, with a Guidelines range of 292-365 months. (*Id.* at 57).

As to the § 3553(a) factors, Bickers presented more than 70 letters, three witnesses, and her allocution, which reiterated her contributions to the community through her church and deeds. (Doc. 225; 252-58, 61-77). Bickers argued her sentence should be commensurate with Mitchell's and Richards' sentences, and the court should not impose a "trial penalty" because she held the government to its burden. (Doc. 252-88-104). The government recommended a 210-month sentence

based on the offense conduct, that the Guidelines range did not account for the tax and wire fraud counts, and an Eleventh Circuit decision where a 210-month sentence for similar conduct was imposed. (*Id.* at 77-88).

After considering "each and every one" of the 3553(a) factors, the district court rejected Bickers's argument that she was being penalized for going to trial, and it noted the breadth and impact of her scheme on the taxpayers and City employees. (*Id.* at 104-10). The court imposed a below-Guidelines sentence of 168 months. (*Id.* at 111). The government asked whether, "given the guideline calculations, . . . this Court would have made the same sentencing, imposed the same sentence regardless of the guideline findings?" (*Id.* at 116). The court confirmed "Yes." (*Id.*)

### C. Standards of Review

1. Limitations on cross-examination are reviewed for a clear abuse of discretion, and whether a defendant's Sixth Amendment rights were violated is reviewed *de novo. U.S. v. Rushin*, 844 F.3d 933, 938 (11th Cir. 2016). Exclusion of evidence is reviewed for harmless error. *U.S. v. Lankford*, 955 F.2d 1545, 1552 (11th Cir. 1992)

27

2. A district court's denial of a motion for a curative instruction is reviewed only for an abuse of discretion and is subject to harmless error review. *U.S. v. Anderson*, 1 F.4th 1244, 1268 (11th Cir. 2021).

3. A district court's denial of a motion for a mistrial is reviewed only for an abuse of discretion. *U.S. v. Wright*, 392 F.3d 1269, 1274 (11th Cir. 2004).

4. The denial of a motion for a judgment of acquittal is reviewed *de novo. U.S. v. Maher*, 955 F.3d 880, 884 (11th Cir. 2020).

5. A district court's findings of fact under the Sentencing Guidelines are reviewed for clear error, though a Sentencing Guidelines error may be harmless where the district court confirms that it would have imposed the same sentence and that sentence is substantively reasonable. *U.S. v. Martinez*, 964 F.3d 1329, 1333 (11th Cir. 2020); *U.S. v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006).

28

## SUMMARY OF THE ARGUMENT

Bickers cross-examined Mitchell for hours on at least 15 different topics that challenged his credibility and bias. The three additional topics she claims should have been permitted were inadmissible character evidence, unrelated to Mitchell's character for truthfulness, and not relevant. When Mitchell testified about his FBI cooperation, he did not lie—he merely did not remember certain details. Any errors as to Mitchell's testimony were harmless because the jury had ample opportunity to assess his credibility as a cooperating witness, and there was overwhelming other evidence of Bickers's guilt.

Bickers was acquitted of conduct connected to Cotena Alexander, a defense witness who invoked her Fifth Amendment privilege before the start of trial. Alexander's emails ordering salt were properly admitted as non-hearsay, and their exclusion would not have changed the outcome of trial.

As to wire fraud, and in light of recently developed case law, the government will seek voluntary dismissal of those counts, and therefore, the Court should remand for resentencing.

Finally, the evidence at trial and sentencing demonstrated that Bickers conduct caused a loss in excess of $1.5 million, and she led the scheme to do so from a high-level position in the City. Her

sentence of 168 months was reasonable, and the district court would have imposed it regardless of its Guidelines calculations.

## ARGUMENT AND CITATIONS OF AUTHORITY

**1. The district court did not abuse its discretion by precluding three narrow topics from Mitchell's cross-examination, and any error was harmless.**

The district court did not abuse its discretion by precluding cross-examination of Mitchell regarding (1) FBI non-payments to Mitchell; (2) a dismissed civil suit; and (3) allegations raised in Mitchell's divorce. These topics were irrelevant, improper character evidence, and risked unfair prejudice that outweighed any probative value. Their exclusion was also harmless.

### A. The district court did not abuse its discretion by excluding the three topics as improper character evidence that was irrelevant and violated Rule 403.

A district court's discretion "to rule on the admissibility of evidence, including the power to limit cross-examination" must be tempered against "the guarantee of the Sixth Amendment's Confrontation Clause." *U.S. v. Maxwell*, 579 F.3d 1282, 1295 (11th Cir. 2009). But the right to cross-examine is not unlimited, and trial courts "retain wide latitude" to impose limits on cross-examination to prevent unfair prejudice, confusion of the issues, and to limit "interrogation that is repetitive or only marginally relevant." *U.S. v. Clotaire*, 963 F.3d 1288, 1296-97 (11th Cir. 2020).

31

The district court did not abuse its discretion by excluding questions about FBI payments to Mitchell because no good faith basis existed to ask those questions. The cooperation file showed that Mitchell received $0 from the FBI, and there was no evidence payment was ever authorized. (Doc. 193-15-17). With evidence that payment never occurred, the topic of payments to Mitchell risked confusing the jury and improperly attempting to discredit Mitchell's testimony by insinuating that he was a paid cooperator. *See U.S. v. Crutchfield*, 26 F.3d 1098, 1102 (11th Cir. 1994) (questions without a good faith basis were an improper attempt "to discredit" a witness's testimony before the jury).

The district court also did not abuse its discretion by finding that that the dismissed DeKalb County lawsuit allegations did not go to Mitchell's character for truthfulness under Rule 608(b). *U.S. v. Taylor*, 417 F.3d 1176, 1179 (11th Cir. 2005) (affirming exclusion of "unfounded complaints" under Rules 404(b) and 608(b)). The court concluded that Bickers wanted to raise the suit to show Mitchell had a propensity for defrauding government officials, so the evidence also violated Rule 404. (Doc. 193-18).

The district court did not abuse its discretion by excluding divorce allegations that Mitchell opened accounts and moved money, under Rules 608, 404, and 402. The district court properly determined there

32

was "nothing inherently untruthful" about these activities, no 404(b) exception applied, and the evidence was irrelevant. (Doc. 193-19-21). And despite these rulings, Bickers was permitted to probe Mitchell's setting up a company to conceal that his company name "was tarnished and [he] needed to change it," and he listed his wife as an officer of the company. (Doc. 245-137-40).

### B. Any error did not violate the Sixth Amendment because Bickers conducted a thorough cross-examination, and any error was harmless.

Not only did the district court act within its discretion by precluding these three topics, but any purported error did not violate the Sixth Amendment and was harmless. Once the Confrontation Clause has been satisfied by sufficient examination, "further questioning is within the district court's discretion." *U.S. v. Garcia*, 13 F.3d 1464, 1468 (11th Cir. 1994). The operative question "is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *Id.* at 1469.

The district court permitted hours of thorough, probing cross of Mitchell on at least 15 topics that highlighted Mitchell's potential bias for the government and his lack of credibility. Bickers explored the scope of his prior cooperation with the FBI, the benefits he received for cooperating, his trial preparation, and his credibility as a Harvard

graduate who was manipulated by a local pastor. The jury heard considerable facts that were sufficient to draw inferences regarding Mitchell's credibility and potential bias. *U.S. v. Burson*, 159 F.3d 1328, 1336-37 (11th Cir. 1998) (holding no Sixth Amendment violation, "in light of extensive evidence presented to impeach [the witness's] credibility" such that additional cross-examination "would have had a minimal effect on the credibility ascribed to him").

Moreover, Confrontation Clause errors are not reversible where they are harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Even in *Van Arsdall*, where the trial court "prohibited *all* inquiry" into a witness's potential bias, the Supreme Court held that the reviewing court should still inquire "whether the non-fully-impeached evidence might have affected the reliability of the factfinding process at trial." *Id.* (emphasis in original). Here, the court permitted substantial probing into Mitchell's bias and credibility, Mitchell's testimony was corroborated on all material points, and the following evidence of Bickers's guilt was overwhelming:

- Richards admitted that he agreed to pay bribes to Bickers. Richards paid $53,000 to Bickers directly for no legitimate work.

- Bickers's bank accounts reflect cash deposits that correspond with payments by the City to Richards and Mitchell and subsequent cash withdrawals by Mitchell. Bickers's bank accounts show the same pattern in 2014, and

34

a bank employee confirmed Bickers went to the bank with Mitchell and provided instructions for deposits.

- Mitchell and Richards possessed internal city documents and information. Mitchell and Richards also inflated their bids to the City in a way that should have priced them out.

- Bickers's girlfriends testified that she instructed them not to make deposits greater than $10,000, and they always had cash on hand. Verdier witnessed Mitchell deliver a bag of bank wrapped cash to Bickers and heard them discuss paying city officials.

- In 2011, Bickers purchased a $775,000 home in cash on a $62,500 salary with no alternative, legitimate source of income.

- Bickers lied to the City about receiving money from city contractors while she was an Atlanta employee, and then—to bolster her experience to obtain a contract in Jackson—she admitted her involvement in the sidewalks and snow contracts.

Any error in limiting Mitchell's already extensive cross was harmless, and the Court should affirm Bickers's conviction.

**2. The district court did not abuse its discretion by denying Bickers's motion for a curative instruction where Mitchell gave no false testimony, and any falsehoods were immaterial.**

The government did not commit prosecutorial misconduct when Mitchell testified that he did not remember certain specifics of his cooperation, and that testimony was not false. And within the context of all his testimony, any alleged falsity in Mitchell's testimony was not material to the jury's assessment of his credibility and bias.

35

Prosecutors cannot knowingly use false evidence or perjured testimony. *Giglio v. U.S.*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959). Prosecutors violate *Napue/Giglio* if (1) the witness willfully lied under oath, (2) the government knowingly failed to correct the lie, and (3) the lie was material. *U.S. v. Horner*, 853 F.3d 1201, 1206 (11th Cir. 2017). "Perjured testimony 'must be given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory.'" *Id.*

## A. Mitchell had a faulty memory, and any inconsistencies with the FBI file do not prove knowing falsity.

Contrary to Bickers's assertion that Mitchell denied being tasked by the FBI with bribing officials, Mitchell repeatedly responded that he did not remember that task. Mitchell's faulty memory is not the basis of a *Napue/Giglio* violation. *Routly v. Singletary*, 33 F.3d 1279, 1286 (11th Cir. 1994). In *Routly*, this Court held that a witness's "not sure" and "did not know" responses to questions about her immunity agreement were insufficient to establish falsity. *Id., see U.S. v. Bailey*, 123 F.3d 1381, 1395-96 (11th Cir. 1997) (where agent did not remember making a recording, memory lapse insufficient to establish *Giglio* violation).

Similarly, as to receiving admonishments from the FBI, Mitchell responded he did not remember the FBI giving "instructions on how

36

to be an ethical cooperator," and did not remember that he could "break the law, as long as [he] broke the law working with [the FBI]." (Doc. 245-102-03). Mitchell denied "that every three months [the FBI] would review [...] the responsibilities and obligations [he] had as a cooperator," and Bickers moved on. (*Id.* at 103-04). These responses evidence Mitchell's faulty memory, not falsity.

Bickers reliance on the FBI's file to establish both that Mitchell lied and that the government knew he lied is misplaced because the file does not contain Mitchell's own statements, and is internally inconsistent. "[A] prior statement that is merely inconsistent with a government witness's testimony is insufficient to establish prosecutorial misconduct." *U.S. v. Stein*, 846 F.3d 1135, 1149 (11th Cir. 2017). Though Mitchell's recollection may have been different than portions of the file, that does not establish his testimony was false. And because the file itself was inconsistent about the length and breadth of Mitchell's cooperation, there was no basis or need for the government to correct Mitchell's testimony. *U.S. v. Michael*, 17 F.3d 1383, 1385 (11th Cir. 1994) (refusing to impute knowledge of falsity to prosecutor where two witnesses' testimony conflicted).

Finally, Mitchell's forgetful testimony is a far cry from *Napue* and *Giglio*, where the defense was prejudiced by the government failing to produce impeachment evidence. Here, the 250-page FBI file was

37

produced three months before trial, and the district court permitted Bickers to impeach Mitchell based on the contents of the file. Bickers never attempted to refresh Mitchell's recollection with the cooperation file. Bickers's elicited Mitchell's testimony with vaguely-word questions, and none of his answers violated *Napue/Giglio*.

## B. The alleged falsities were not material to the verdict.

False testimony is only material to constitute a due process violation if there is a "reasonably likelihood that the false testimony could have affected the judgment of the jury." *Bailey*, 123 F.3d at 1396. The "thrust of *Giglio* and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and the prosecutor not fraudulently conceal such facts from the jury." *Ventura v. Attorney General, Fla.*, 419 F.3d 1269, 1282 (11th Cir. 2005). Thus, where a witness's potential bias is disclosed to the jury, and the defense has an opportunity to argue the alleged falsity in closing arguments, this Court has held any alleged false testimony to be immaterial. *Routly*, 33 F.3d at 1286-87; *Bailey*, 123 F.3d at 1396-97.

Mitchell admitted he previously cooperated with the FBI, he had constant contact with the FBI for years, that while cooperating he betrayed long-time friend Richards, and that he received benefits for his cooperation against Bickers. This testimony highlighted to the jury

that he had a motivation to testify favorably for the government, and the jury was able to assess his credibility given his prior and present dealings with the government. Bickers fully cross-examined Mitchell on these issues, and later argued to the jury that Mitchell provided false testimony as to the scope and length of his cooperation. Yet, despite counsel's explicit argument that Mitchell perjured himself and that Bickers could not be convicted if they did not credit his testimony, the jury convicted her. The jury was not shielded from the fact that Mitchell was cooperating with the FBI for years, and Bickers urged the jury to believe he was cooperating much longer than he admitted.

Finally, even if the alleged false testimony was material under *Giglio*, it is still subject to harmless-error review. *Trepal v. Sec'y, Fla. Dept. of Corrections*, 684 F.3d 1088, 1113-14 (11th Cir. 2012). As discussed above, Mitchell's testimony was corroborated by numerous other witnesses and financial analysis. Mitchell's alleged false statements about how long he previously cooperated and his specific cooperation tasks did not affect the overwhelming evidence against Bickers.

**3. The district court did not abuse its discretion by denying Bickers's motion for a mistrial based on the admission of three non-hearsay emails that were written by a potential defense witness who exercised her Fifth Amendment privilege.**

The district court did not abuse its discretion by denying Bickers's motion for a mistrial because the government did not make Cotena Alexander unavailable, and Alexander's emails were admitted for a non-hearsay purpose.

The denial of a motion for a mistrial is reviewed for abuse of discretion. *U.S. v. Ettinger*, 344 F.3d 1149, 1161 (11th Cir. 2003). To demonstrate an abuse of discretion, a defendant must prove that her "substantial rights were prejudicially affected," by showing that "a reasonable probability" exists that, but for the error, "the outcome of the trial would have been different." *U.S. v. Newsome*, 475 F.3d 1221, 1227 (11th Cir. 2007). When the evidence of a defendant's guilt is overwhelming, it is unlikely that substantial prejudice occurred. *See U.S. v. Wilson*, 149 F.3d 1298, 1302 (11th Cir. 1998).

**A. The district court did not abuse its discretion by finding that the United States did not cause Alexander's unavailability.**

The government cannot substantially interfere with a defense witness's decision to testify "through threats of prosecution, intimidation, or coercive badgering." *U.S. v. Serrano*, 406 F.3d 1208, 1216 (10th Cir. 2005); *see Demps v. Wainwright*, 805 F.2d 1426, 1433 (11th Cir. 1986).

40

Here, the United States did not substantially interfere with Bickers's ability to call Alexander as a witness because:

- Alexander was never available to Bickers as a witness. Alexander (through counsel) announced her decision to assert her Fifth Amendment protections on March 8, 2022, and the government delivered its opening two days later. (Doc. 244-212-17). Therefore, the government's opening could not have caused Alexander to become unavailable;

- Alexander had the benefit and guidance of counsel in deciding whether to invoke her right against self-incrimination. *Serrano*, 406 F.3d at 1216; and

- The only reason the government even knew that Alexander planned to exercise her privilege was because defense counsel failed to list their contact information on Alexander's trial subpoena, and Alexander's attorney contacted the government to invoke her Fifth Amendment rights.

At bottom, the district court did not abuse its discretion by denying Bickers's motion for a mistrial because the government did not interfere with her ability to call Alexander as a witness.

## B. The district court did not abuse its discretion by admitting Alexander's emails as non-hearsay.

Bickers argues that the district court reversibly erred in denying her motion for a mistrial after it admitted "[t]hree different statements, in the form of emails, made by Ms. Alexander" in violation of Bickers's Confrontation Clause protections. (Def. Br. at 22).

41

The Confrontation Clause prohibits the use of testimonial hearsay without providing a defendant an opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004). But the Confrontation Clause "prohibits *only* statements that constitute impermissible hearsay" and "'does not bar the use of ... statements for purposes other than establishing the truth of the matter asserted.'" *U.S. v. Jiminez*, 564 F.3d 1280, 1286 (11th Cir. 2009) (emphasis in original). In other words, when "a trial court admits a statement ... for a purpose other than for the truth of the matter asserted, the admissibility of that statement does not violate the Confrontation Clause." *Id.* at 1287. The district court did not abuse its discretion in denying Bickers's motion for a mistrial because the Alexander emails were not hearsay, and their admission did not implicate Bickers's Sixth Amendment rights.

First, the district court did not abuse its discretion by admitting Government's Exhibit 100, an email saying that Atlanta needed more salt, to show the effect on the listener. (Doc. 242-160). Indeed, once that exhibit was admitted, Braswell explained that after she received Alexander's email, the City of Atlanta contacted a vendor regarding the delivery of additional salt. *U.S. v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) ("Generally, an out-of-court statement admitted to show its effect on the hearer is not hearsay.").

Second, the district court did not abuse its discretion by admitting Government's Exhibits 101 and 103, emails ordering salt from a contractor, because: (a) the emails were not hearsay as they were orders for services, and such are not even capable of being true or false; and (b) the emails showed their effect on their recipients. *U.S. v. Perry*, 14 F.4th 1253, 1274 (11th Cir. 2021) ("out-of-court declarations that are more in the nature of an order or a request and that, to a large degree, are not even capable of being true or false are also not hearsay").[2]

Nor can Bickers show that but for the admission of these emails "the outcome of the trial would have been different." *Newsome*, 475 F.3d at 1227. After all, the evidence against Bickers on the offenses of conviction was overwhelming. *See above* § 1.B. Moreover, the jury acquitted Bickers of Count 2—the only count to which Alexander's involvement directly related. (Doc. 213). In other words, the outcome of the trial could not have been different if Alexander testified or if the court excluded the emails, because not only was the evidence as to

---

[2] The district court also could have admitted Exhibit 103 as co-conspirator's statement made during and in furtherance of the conspiracy. FED. R. EVID. 801(d)(2)(E); *see Martin v. U.S.*, 949 F.3d 662, 667 (11th Cir. 2020).

43

the other counts overwhelming, but the jury already acquitted Bickers on Count 2.

**4. The Court should remand for the United States to seek dismissal of the wire fraud counts and resentencing.**

Since the trial of this matter, the law regarding wire fraud has developed significantly. Although the Eleventh Circuit has yet to consider the issue, recent Supreme Court precedent and out-of-circuit decisions have rejected wire fraud prosecutions premised on lies which allow an employee to maintain employment and that are only indirectly related to the money or property obtained. Because of these post-trial developments in the law, the government intends to seek dismissal of Bickers's four wire fraud counts.

To prove wire fraud, the government must establish that: (1) the defendant knowingly engaged in a scheme to defraud; (2) an object of the scheme was to obtain money or property; and (3) the defendant used an interstate wire communication to further the scheme. *See* 18 U.S.C. § 1343; *Kelly v. United States*, 140 S. Ct. 1565, 1571-72 (2020).

Here, the evidence showed that:

- From February 2010 to March 2013, Bickers served as the Director of Human Services, earning $62,500 yearly. (Doc. 241-205; Gov't Ex. 48)

44

- ▪ To avoid conflicts of interests, the City required Bickers under penalty of perjury to disclose annually her outside income and its sources. (Doc. 241-176; Gov't Ex. 51).

- ▪ On her 2011 disclosure form, Bickers falsely attested that she did not receive over $100,000 in bribe money from Mitchell. (Docs. 240-101-02; 244-91-99; Gov't Exs. 51, 200).

- ▪ On her 2012 disclosure form, Bickers falsely attested that she did not receive over $500,000 in bribe money from Mitchell and Richards. (Docs. 240-101-02, 178-81; 244-156-575; Gov't Exs. 51, 201).

- ▪ The penalty for lying on a disclosure form included termination. (Doc. 241-178-180; 243-98).

- ▪ In February and March 2013, the City paid Bickers her salary via interstate money transfers. (Docs. 241-205-07; 243-87-92).

- ▪ The City would have terminated an employee who failed to disclose receiving $500,000 from City contractors (Docs. 241-180-84; *see* 243-98).

Recently, when considering undisclosed self-dealing by employees, the Ninth Circuit and the D.C. Circuit held that wire and bank fraud prosecutions could not be sustained. *U.S. v. Yates*, 16 F.4th 256, 267-68 (9th Cir. 2021); *U.S. v. Guertin*, __ F.4th__, 2023 WL 3470862, at *1 (D.C. Cir. May 16, 2023). Two district courts have concluded that an employee who lies to their employer and keeps their salary in the process cannot be prosecuted for wire fraud. *U.S. v. Tao*, No. 19-20052-JAR, 2022 WL 4355302, at *22 (D. Kan. Sept. 20, 2022); *U.S.*

*v. Smith*, No. 1:17-CR-00020, 2022 WL 2103063, at *10 (D. Guam June 3, 2022). Additionally, two recent Supreme Court decisions, though not directly on point, also hold that the "money or property" requirement of wire fraud must be more than an "incidental byproduct" of the fraud, and it cannot be premised on "intangible interests" such as the right to control the use of one's assets. *Kelly,* 140 S. Ct. at 1573-74; *Ciminelli v. U.S., et al.*, No. 21-1170, 2023 WL 3356526 (May 11, 2023).

On reconsideration and in light of recent developments in the law, without conceding the sufficiency of the evidence for the four wire fraud counts, the government intends to withdraw prosecution of the wire fraud counts and asks this Court to remand to the district court so that the government may move to dismiss those counts. The district court imposed a 168-month sentence on the wire fraud counts, with the sentence on the other counts—which have lower statutory maximums—to run concurrently. Accordingly, dismissal of the wire fraud counts should result in a limited re-sentencing. That re-sentencing should reflect the statutory maximums of the remaining convictions, however, the Sentencing Guidelines calculations are unaffected.

Accordingly, this Court should remand for the limited purpose of the United States moving to dismiss the wire fraud counts and for a

limited resentencing based on the new statutory maximums and the
§ 3553(a) factors.

5. **The district court did not clearly err in applying the Sentencing Guidelines, and any purported error was harmless because the district court said that it would impose the same sentence regardless.**

There was no clear error in the district court's findings at
sentencing that the loss amount exceeded $1.5 million, Bickers held a
high-level decision-making position, and she was a manager of an
extensive bribery scheme.

A. **The district court did not clearly err in calculating the bribe amount or in finding that the 2014 bribery scheme constituted relevant conduct.**

According to Bickers, "the government failed" to prove that "the
alleged [2014 bribe] funds were relevant conduct from a continuing
scheme." (Def. Br. at 29-30).

Under U.S.S.G. § 1B1.3, "a district court must consider all
relevant conduct attributable to the defendant." *U.S. v. Maddox*, 803
F.3d 1215, 1221 (11th Cir. 2015); *see U.S. v. Valarezo-Orobio*, 635 F.3d
1261, 1264 (11th Cir. 2011) ("relevant conduct is a question of fact
reviewed for clear error"). Section 1B1.3 provides that relevant
conduct includes all conduct committed, aided, or caused by the
defendant in furtherance of a scheme, that was "part of the same
course of conduct or common scheme or plan as the offense of

conviction." U.S.S.G. § 1B1.3(a)(1), (2). Two or more offenses are part of a "common scheme or plan" if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3 cmt. n.5(B)(i). The district court did not clearly err in finding by a preponderance of the evidence that the bribe money Bickers received in 2014 constituted relevant conduct.

First, the district court did not clearly err in finding that Bickers executed the 2014 bribery scheme, because:

- Mitchell testified that: (a) the bribe scheme continued in 2014, (b) whenever he withdrew more than nominal amounts of cash, he gave that money to Bickers, (c) he paid Bickers bribe money in 2014 (directly and on behalf of Richards), and (d) that Bickers was to spread the money around to other City officials to steer contracts to Mitchell and Richards. (Docs. 244-49-62,134, 160-61; 245-25-28; Gov't Ex. 202).

- Richards testified that: (a) the bribe conspiracy continued in 2014, (b) he believed in 2014 that he was bribing Bickers (through Mitchell) to continue receiving work under the sidewalk contract, (c) Bickers never did legitimate work for him, and (d) Richards $15,000 payment directly to Pirouette Companies was a bribe payment to Bickers. (Docs. 241-41-43; 247-75; Gov't Ex. 205).

- In 2014, bank records show numerous payments from Mitchell and one payment from Richards to Bickers. (Gov't Exs. 202, 205).

- Mitchell received emergency snow removal work in 2014, even though he was not an approved vendor, the approved vendors were available to complete the work, and Mitchell charged more than the approved vendors. (Docs. 242-190-91; 242-233; 243-23-28, 48-49; 247-23-29, 61; 244-162, 164-67; Gov't Exs.128, 111, 131-35, 176-77, 212).

- Despite not being pre-approved, Mitchell received more emergency snow removal work than any approved vendor. (Gov't Ex. 212).

- Mitchell and Richards were charged with and pleaded guilty to conspiring to pay Bickers bribe money in 2014. (Docs. 240-165-66; 244-79-80)

- The jury convicted Bickers of money laundering in 2014—evidencing its agreement that Bickers received and spent bribe proceeds in 2014. (Doc. 213).

Second, the district court did not clearly err in finding that the conduct from the 2011 (Count 1) and 2014 (Count 2) bribery counts represented a "common scheme or plan" because both schemes:

- Shared the common accomplices of Mitchell and Richards—who made bribe payments to Bickers from 2011 to 2014. *U.S. v. Siegelman*, 786 F.3d 1322, 1334 (11th Cir. 2015);

- Had a common victim, the citizens of Atlanta—who were "deprived . . . of the honest services" of high-ranking City officials. *Id.*;

49

- Were "committed for the common purpose of obtaining . . . money for" Bickers, Mitchell, and Richards, by obtaining lucrative City contracts. *Id.*; and

- Shared "the same *modus operandi*" as Bickers used her "political power and influence to effectuate" directly and indirectly the City contracts at issue in Count 1 and the emergency snow removal and sidewalk work at issue in 2014. *Id.*

Accordingly, the district court did not clearly err in finding that 2014 bribe payments constituted relevant for Count 1.

### B. The district court did not clearly err in finding that the bribe amount was more than $1.5 million.

Bickers also claims that "the government failed" to prove that "each transaction" alleged as a bribe payment in 2014—was actually a bribe. (Def. Br. at 29-30).

The "Guidelines do not require a precise determination of loss." *U.S. v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011). To the contrary, courts "need only make a reasonable estimate of the loss, given the available information." *U.S. v. Whitman*, 887 F.3d 1240, 1248 (11th Cir. 2018). The district court's loss calculation is reviewed only for clear error. *U.S. v. Crawford*, 407 F.3d 1174, 1177 (11th Cir. 2005). This Court has rejected the idea that "the Government and the court [must] sift through years of bank records and receipts to ascertain itemized proof of every single transaction that should be chalked up as a loss." *U.S. v. Campbell*, 765 F.3d 1291, 1304-05 (11th

50

Cir. 2014) (citing *U.S. v. Orton*, 76 F.3d 331, 334-35 (11th Cir. 1996). Here, the district court did not clearly err calculating the bribe amount.

To begin, the evidence proved that in 2014, Mitchell and Richards paid Bickers and her companies approximately $2,027,126.11 in bribe payments. (Gov't Ex. 202). As stated above, Mitchell and Richards testified to paying bribe money to Bickers in 2014—and the bank records convincingly corroborate that testimony.

Bank records from 2014 show: (a) $1,540,153.11 in directly traceable money transfers and checks from Mitchell orRichards to Bickers, and (b) $486,973 in cash deposits in Bickers's accounts. (*See* Gov't Ex. 202). Importantly, of the $486,973 in cash deposits into Bickers's accounts, $465,000 of those deposits were perfectly sourced from Mitchell (in that Mitchell withdrew a large, round sum of cash from his accounts and on the same date Bickers deposited into her various accounts the exact same amount of cash in round sum transactions). (Gov't Ex. 202). Therefore, of the $2,027,126.11 in relevant conduct, $2,005,153.11 or 98.9% was directly traced or perfectly sourced from Mitchell and Richards. Given that courts "need only make a reasonable estimate of the loss," the district court

did not clearly err in calculating that the bribe amount for 2014 was $2,027,126.11. (Doc. 252-10); *Whitman*, 887 F.3d at 1248.[3]

And, of course, the 2014 bribe amount—when coupled with the unchallenged bribe amount of $910,053.20 from 2011-2013—proved that Bickers accepted $2,937,179.31 in bribe money. The district court did not clearly err when calculating that the bribe amount for Count 1 exceeded $1.5 million under § 2B1.1(b)(1)(I). (Doc. 252-10).

### C. As the City of Atlanta's Director Human Services, Bickers possessed a high-level decision-making position.

The district court did not clearly err in finding that Bickers possessed a high-level decision-making position.

Under § 2C1.1(b)(3), if "the offense involved ... any public official in a high-level decision-making or sensitive position, increase by 4 levels." As relevant here, a high-level decision-making or sensitive position "means a position characterized by a direct authority to make decisions for, or on behalf of, a government department ... or by a

---

[3] That figure was conservative. The government could have calculated the loss amount: (a) by including Mitchell's cash withdrawals (as opposed to Bickers's cash deposits), given Mitchell's testimony that all his non-nominal cash withdrawals were paid to Bickers; or (b) by determining the benefits received by Mitchell or Richards given Richards's testimony regarding "50 or 60 percent" profit margins, and Mitchell's exorbitant 2014 snow removal profit margin. (Doc. 241-34; 244-134; Gov't Exs. 176-77, 202 (Column II)).

substantial influence over the decision-making process." U.S.S.G. § 2C1.1 cmt. n.4(A). Despite Bickers's contrary arguments, the enhancement does not require that the public official's decision-making authority relate to or be used to affect the offense. *U.S. v. Hills*, 27 F.4th 1155, 1194 (6th Cir. 2022) (affirming the enhancement where *inter alia* "the offenses did not directly involve [the defendant's] authority"). *Compare* U.S.S.G. § 2C1.1(b)(3) *with* U.S.S.G. § 3B1.3.

The district court did not clearly err in finding that Bickers held a high-level decision-making position and possessed substantial influence over the decision-making processes, because:

- The City of Atlanta considered the Director of Human Services to be a "senior management position" and "leadership position." (Docs. 240-80, 93-94; 241-173);

- Bickers reported directly to the mayor. (Doc. 240-113 ("At the level where Pastor Bickers was, that would have been a discussion between she and her supervision, the mayor");

- Bickers self-described her position as being "[r]esponsible for homeless services in the City of Atlanta," and classified her position as being a "Commissioner; Department Head; or its equivalent." (Gov't Exs. 51-2, 218-I);

- Another department head explained that such positions involved "provid[ing] leadership and direction" to the department," supervising the department's staff, and hiring and firing department employees. (Doc. 243-96-98);

53

- As its director, Bickers made decisions for the Human Services Department. (Doc. 252-11-12 (when asked by the district court, "Did [Bickers] make decisions for the Human Services Department;" defense counsel responded, "I believe that was her position, yes.")); and

- Circumstantial evidence proved that Bickers also possessed "substantial influence over the decision-making process" as shown by her ability to steer City contracts to Mitchell and Richards despite their low rankings and inflated work costs, and her later admission that she was "responsible" for those contracts. (Doc. 240-15-16; 241-15-16, 31-36; 244-114, 119, 152; 247-42-44); *see U.S. v. Smith*, 429 F. App'x 840, 845 (11th Cir. 2011) ("a defendant's position may be evaluated in terms of the influence that the defendant [actually] exercised").

At bottom, as its Director, Bickers possessed the "direct authority to make decisions for, or on behalf of" the Department of Human Services. U.S.S.G. § 2C1.1 cmt. n.4(A). And, as shown at trial, Bickers also was able to influence awards of the relevant City contracts.

### D. Bickers had a leadership role in an otherwise extensive scheme.

Though there were less than five knowing participants, the district court did not clearly err in applying a 3-level leadership enhancement because Bickers's scheme was otherwise extensive. Under U.S.S.G. § 3B1.1(b), an "'otherwise extensive' operation does not require a set number of criminally responsible participants," and courts may consider factors such as "the length and scope of the criminal activity," "the number of persons involved," and the use of

"unknowing services of many outsiders." *U.S. v. Slaughter*, 298 F. App'x 876, 877 (11th Cir. 2008) (affirming 4-level enhancement where there were less than five participants, but the loss was over $5.5 million); *U.S. v. Gupta*, 463 F.3d 1182, 1198 (11th Cir. 2006) (enterprise was otherwise extensive with only four knowing participants).

Here, Bickers's bribery scheme resulted in $18 million in city contracts and involved complex transactions where Richards paid Mitchell's company, Mitchell wrote checks to himself, cashed the checks, then gave the cash to Bickers to either hoard in her home or spread across several bank accounts. The scheme involved many people—not just Mitchell and Richards—at least 11 bank accounts belonging to Bickers, her three girlfriends, and their respective companies; various city employees who provided inside information to Bickers and inexplicably selected Richard and Mitchell for contracts; numerous companies; structured deposits; and it spanned over five years. This was not a "relatively small enterprise" as Bickers suggests. (Def. Br. at 32); *see* U.S.S.G. § 3B1.1 cmt. n.3 ("a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive").

The district court did not clearly err in finding that Bickers held a leadership role. In her own words, Bickers was "responsible" for the

55

contracts for which Mitchell and Richards paid bribes. (Doc. 247-42-44, Gov't Ex. 218I). Bickers recruited Mitchell, who brought in Richards, and talked about paying bribes to city officials openly in front of her girlfriend. Bickers used joint accounts with girlfriends and family to covertly move bribe proceeds and instructed Mitchell, Verdier, and Poole to structure cash deposits. Her girlfriends, Mitchell, and Richards all relied on Bickers's superior knowledge of the scheme, insider information about the contracts, and her ability to "spread the money around" to ensure Mitchell and Richards got work they otherwise would not have received and bilked the City for it.

Bickers told Mitchell on which contracts to bid and provided the inside information that gave Mitchell and Richards an advantage in the bid process. Bickers also specified her percentage of the contracts and directed Mitchell to pay her in cash so often he started to feel like a drug dealer. Bickers required Mitchell to keep her involved even after the contracts were awarded, and City officials believed that Bickers had some form of control over him. And she provided handwritten instructions and accompanied Mitchell to the bank to direct where and in what amounts bribe payments should be made.

The district court's application of a 3-level enhancement and rejection of Bickers's argument that Mitchell played a more significant role than she was consistent with this Court's precedent. For example,

56

in *U.S. v. Esquenazi*, the defendant argued that his co-conspirators had substantial independent roles in a bribery scheme. 752 F.3d 912, 938 (11th Cir. 2014). This Court affirmed a 4-level enhancement, reasoning that the roles of his "co-conspirators do not change our analysis even if those individuals also played major roles." *Id.* Instead, what mattered was the defendant "actually participated in many of the decisions involving the bribery scheme." *Id.* Here, Bickers came up with the scheme, found knowing participants and unwitting outsiders, explained methods to avoid detection and prolong the conspiracy, and set the goals of the conspiracy. This scheme does not happen without Bickers's leadership.

### E.  Any sentencing error was harmless.

This Court "need not review [a sentencing] issue when (1) the district court states it would have imposed the same sentence, even absent an alleged error, and (2) the sentence is substantively reasonable." *U.S. v. Goldman*, 953 F.3d 1213, 1221 (11th Cir. 2020). Therefore, "when a district court states that the sentence it has imposed would not have changed even with a different guideline calculation, [the reviewing courts] assume there was an error, reduce the guideline range according to the way the defendant argued, and analyze whether the sentence would be substantively reasonable under that guideline range." *U.S. v. Grushko*, 50 F.4th 1, 18 (11th Cir. 2022).

This Court's review of the reasonableness of a sentence is "deferential," and "the party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both [the] record and the factors in section 3553(a)." *U.S. v. Valnor*, 451 F.3d 744, 750 (11th Cir. 2006). Here, even if the district court erred in applying the Sentencing Guidelines, any such error was harmless because Bickers's sentence was substantively reasonable.

During the sentencing hearing, the district court confirmed that it would have "imposed the same sentence regardless of the guideline findings." (Doc. 252-116). If Bickers had succeeded in her sentencing objections, the resulting custodial Guidelines range would have been 108-135 months. (Def. Br. at 35; *see* PSR ¶¶ 31-50).

The 168-month sentence was substantively reasonable regardless of the Sentencing Guidelines range because:

- The district court considered the § 3553 factors in fashioning its sentence. (Doc. 252-104); *see U.S. v. Hunt*, 459 F.3d 1180, 1185 (11th Cir. 2006).

- Bickers received a non-consecutive sentence that was well below the total statutory maximum—even though the district court could have imposed a sentence of up to five years in prison on Counts 1 and 12, up to 20 years on Counts 4-6, up to 10 years on Counts 7-10, and could have imposed those sentences consecutively. *U.S. v. Valnor*, 451 F.3d 744, 751–52 (11th Cir. 2006) (affirming an upward variance in part because the ultimate sentence was "appreciably below the length of the statutory maximum").

- The § 3553 factors confirm the reasonableness of Bickers's sentence. The egregious nature and circumstances of the offense support the sentence, in that: (1) Bickers orchestrated a multi-year, multi-million-dollar bribery scheme; (2) Bickers criminal acts cost the citizens of Atlanta millions of dollars; (3) Bickers hid her scheme by lying on her financial disclosure forms and by structuring cash deposits, and (4) Bickers did not pay taxes on her ill-gotten gains.

- Given the multi-count adjustments rules, the Guidelines range did not account for Bickers's tax fraud conviction. *See* U.S.S.G. § 3D1.4(c) ("additional punishment for the additional crimes" may be appropriate if the conduct is not considered by the Guidelines).

- Bickers has not even argued (much less carried her burden of showing) that her sentence was substantively unreasonable. (*See* Def. Br. at 29-34).

Because Bickers's 14-year sentence was substantively reasonable, any purported Sentencing Guidelines error was harmless.

59

## CONCLUSION

This Court should remand for the limited purpose of allowing the government to seek dismissal of Bickers's wire fraud counts and for a limited resentencing that considers the statutory maximums of the remaining convictions and the § 3553(a) factors (without recalculating the Sentencing Guidelines, which remain unaffected by the dismissals). The Court should affirm as to all other grounds.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

JEFFREY W. DAVIS
*Assistant United States Attorney*

TIFFANY R. DILLINGHAM
*Assistant United States Attorney*

## CERTIFICATE OF COMPLIANCE AND SERVICE

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 word processing software in 14-point Goudy Old Style.

This brief complies with the 13,000 word type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because, according to the word processing software, it contains 12,195, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

Today, this brief was uploaded to the Court's website using the CM/ECF system, which automatically sends notification to the parties and counsel of record:

> DREW FINDLING, ESQ.
> MARISSA GOLDBERG, ESQ.

June 23, 2023

/s/ Tiffany R. Dillingham
TIFFANY R. DILLINGHAM
    *Assistant United States Attorney*

61