CASE NO. 22-13174

---

## IN THE UNITED STATES COURT OF APPEALS
## ELEVENTH CIRCUIT

---

UNITED STATES OF AMERICA

Appellee,

v.

MITZI BICKERS

Appellant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DISTRICT COURT CASE NO. 1:18-CR-98-SCJ-LTW-1

---

## REPLY BRIEF OF APPELLANT MITZI BICKERS

---

Marissa Goldberg                          Drew Findling
Georgia Bar No. 672798                    Georgia Bar No. 260425

The Findling Law Firm
3575 Piedmont Rd. NE
Tower 15, Suite 1010
Atlanta, Georgia 30305
(404) 460-4500

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 11th Circuit Rule 26.1-1, the following is a list of individuals who have an interest in the outcome of this case:

1. Bickers, Mitzi – Appellant/ Defendant

2. Davis, Jeffrey – Assistant United States Attorney

3. Kitchens, Nathan - Assistant United States Attorney

4. Dillingham, Tiffany – Assistant United States Attorney

5. Findling, Drew – Attorney for Appellant

6. Goldberg, Marissa - Attorney for Appellant

7. Kelehear, Zachary - Attorney for Appellant

8. Jones, Steve Hon. – U.S. District Judge, United States District Court for the Northern District of Georgia

9. Connors, Kelly – Assistant United States Attorney

10. Buchanan, Ryan – United States Attorney for the Northern District of Georgia

11. Mitchell, Elvin R. – Companion case

12. Richards, Charles P. – Companion case

13. Sommerfeld, Lawrence R. – Assistant United States Attorney

14. United States of America – Appellee/ Plaintiff

## STATEMENT OF ORAL ARGUMENT

Appellant, Mitzi Bickers, requests oral argument in this appeal pursuant to Fed. R. App. 34. This appeal involves various issues that are complex and fact-specific. Oral argument will assist the Court in efficiently considering the issues and the facts and in making its determination. Additionally, in light of new issues presented in the Government's reply brief, this case presents further complexities which increase the need for oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................................. i

STATEMENT OF ORAL ARGUMENT ..................................................................... ii

TABLE OF CONTENTS........................................................................................... iii

TABLE OF AUTHORITIES ...................................................................................... v

REPLY ARGUMENT AND CITATIONS TO AUTHORITY ..................................... 1

I.      The District Court Abused Its Discretion and Violated Ms. Bickers' Sixth Amendment Right to Confrontation by Limiting Testimony Regarding Mr. Mitchell's Government Cooperation, and Such Error Was Not Harmless ..................................................... 1

    A.      The District Court abused its discretion by barring testimony on three topics as improper character evidence under Rule 403. ....................................................... 1

    B.      Ms. Bickers' Sixth Amendment Rights Were Violated and She Was Not Allowed a Thorough Cross Examination. ............................................................................. 5

II.     The District Court Abused Its Discretion When It Denied Defendant's Motion for a Curative Instruction After the Government's Witness Gave False Testimony Which the Government Knew to Be False. ................................................................................. 7

    A.      Mitchell Gave Patently False Testimony.................................................... 7

    B.      Mitchell's False Testimony Was Material to the Verdict ............................ 8

III.    The District Court Abused Its Discretion and Committed Reversible Error in Admitting Ms. Alexander's Statements and Denying Defendant's Motion for Mistrial on the Issue. ...... 10

    A.      The United States Caused Alexander's Unavailability ............................. 10

B.      Alexander's Emails Constituted Hearsay .................................................. 12

IV.    Remand and Dismissal of the Four Wire Fraud Counts is Insufficient To Remedy the Harm At Issue Here. ........................................................................................ 13

A.      The Indictment .................................................................................... 14

B.      The Trial ............................................................................................. 15

V.    The District Court Erred in Applying the Sentencing Guidelines ................................ 17

A.      Relevant Conduct ............................................................................... 17

B.      The Loss Amount ............................................................................... 18

C.      "High-Level Decision-Making" ........................................................ 19

D.      An "Otherwise Extensive" Scheme ................................................... 20

CONCLUSION ............................................................................................................ 21

CERTIFICATE OF COMPLIANCE AND SERVICE................................................. 23

# TABLE OF AUTHORITIES

**Cases**

Delaware v. Van Arsdall, 475 U.S. 673 (1986)........................................................6

Demps v. Wainwright, 805 F. 2d 1426 (11th Cir. 1986).........................................11

Giglio v. United States, 405 U.S. 150 (1972)........................................................7, 9

Napue v. Illinois, 360 U.S. 264 (1959)....................................................................7

Routly v. Singletary, 33 F. 3d 1279 (11th Cir. 1994)..............................................8

U.S. v. Agurs, 427 U.S. 97 (1976)..........................................................................10

U.S. v. Baptista-Rodriguez, 17 F.3d 1354 (11th Cir. 1994).....................................2

U.S. v. Campbell, 765 F. 3d 1291 (11th Cir. 2014)........................................... 20, 21

U.S. v. Clotaire, 963 F.3d 1288 (11th Cir. 2020) ....................................................1

U.S. v. Crawford, 707 F. 2d 447 (10th Cir. 1983)...................................................12

U.S. v. Garcia, 13 F.3d 1464 (11th Cir. 1994).........................................................2

U.S. v. Grajales, 450 Fed. Appx. 893 (11th Cir. 2012) ..........................................18

U.S. v. Gupta, 463 F. 3d 1182 (11th Cir. 2006) .....................................................23

U.S. v. Hills, 27 F. 4th 1155 (6th Cir. 2022)...........................................................21

U.S. v. Hills, 27 F. 4th 1155, 1194 (6th Cir. 2022) .................................................22

U.S. v. Michael, 17 F.3d 1383 (11th Cir. 1994) .......................................................9

U.S. v. Perry, 14 F. 4th 1253 (11th Cir. 2021)........................................................13

U.S. v. Reddy, 534 Fed. Appx. 866 (11th Cir. 2013). .............................................19

U.S. v. Serrano, 460 F. 3d 1208 (10th Cir. 2005) ....................................................12

U.S. v. Slaughter, 298 F. App'x 876, (11th Cir. 2008)...............................................22

U.S. v. Stein, 846 F.3d 1135 (11th Cir. 2017) ...........................................................9

U.S. v. Taylor, 417 F.3d 1176 (2005) .........................................................................4

U.S. v. Whitman, 887 F.3d 1240 (11th Cir. 2018). ...................................................20

U.S. v. Williams, 837 F.2d 1009 (11th Cir. 1988).......................................................2

Ventura v. Attorney General, Fla, 419 F.3d 1269 (11th Cir. 2005) .........................10

**Rules**

U.S.S.G § 2C1.1(b)(3) .................................................................................................20

U.S.S.G. § 1B1.3 cmt. N.5(B)(i)............................................................................ 17, 18

**REPLY ARGUMENT AND CITATIONS TO AUTHORITY**

I.    **The District Court Abused Its Discretion and Violated Ms. Bickers'**
      **Sixth Amendment Right to Confrontation by Limiting Testimony**
      **Regarding Mr. Mitchell's Government Cooperation, and Such Error**
      **Was Not Harmless**

Appellee mischaracterizes the barred testimony as "narrow." Doc. 29, p. 47.
While appellee and appellant agree that the District Court barred testimony on
three pertinent topics, those topics were directly relevant to the witness, Mr.
Mitchell's, character for truthfulness and long history of fraudulent behavior.

   A.    **The District Court abused its discretion by barring testimony**
         **on three topics as improper character evidence under Rule 403.**

Appellee inaptly relies on U.S. v. Clotaire, 963 F.3d 1288, 1296-97 (11th Cir.
2020) to delineate trial courts' "'wide latitude' to impose limits on cross-
examination to prevent unfair prejudice, confusion of the issues, and to limit
'interrogation that is repetitive or only marginally relevant." Doc. 29, p. 47. The
full quote reads: "Trial judges 'retain wide latitude to impose *reasonable* limits on
cross-examination based on concerns about, among other things, confusion of the
issues or interrogation that is repetitive or only marginally relevant.'" Clotaire, 963
F.3d at 1296 (quoting U.S. v. Baptista-Rodriguez, 17 F.3d 1354, 1370-71 (11th Cir.

1994) (emphasis added)). This Court's 1994 holding in Baptista made clear that while trial judges do "retain wide latitude to impose reasonable limits on cross examination," the defendant must, nevertheless, be given a "full and fair opportunity to probe and expose [the] infirmities [in a witness' testimony] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." Id. (quoting U.S. v. Williams, 837 F.2d 1009 (11th Cir. 1988)). Additionally, the Court held, "[f]ull cross-examination is particularly critical when the examinee is a chief government witness." Id. (citing U.S. v. Garcia, 13 F.3d 1464, 1468 (11th Cir. 1994)).

In Baptista, the defendant, Diaz, testified that he had worked as a civilian operative for the FBI for a number of years and that FBI agents authorized him to investigate narcotics. On rebuttal, agents testified that Diaz's relationship with the FBI ended in February 1983, before the relevant conduct occurred. Id. at 1365. Though documentation of that fact existed, it was considered classified information, thus the Court refused to order its production. Id. Diaz's counsel then sought to cross-examine the agent on his knowledge of that document, but the Court prohibited that as well. Id. This Court held that "[t]he district court deprived Diaz of his constitutionally protected opportunity to cross-examine an important government witness when it prohibited counsel from asking Agent Patino any questions about the contents, or even the existence, of the termination document."

2

Id. at 1366. Moreover, the district court erred in holding that the document was immaterial, because "[i]f the jury had believed that Diaz never stopped working for the FBI or that he was liable to be rehired," the jury may have reached a different verdict. Id.

In Ms. Bickers' case, the district court improperly limited testimony from the government's chief witness, Mr. Mitchell, regarding his paid government cooperation, as well as prior acts of alleged business fraud, and acts of dishonesty. As stated in appellant's initial brief, such testimony was pivotal to the jury's determination of credibility and ultimately, its verdict.

Defense had a good faith basis to inquire into Mr. Mitchell's paid government cooperation, although the government cites U.S. v. Crutchfield, 26 F. 3d 1098 (11th Cir. 1994) to suggest otherwise. In Crutchfield, a prosecution regarding the illegal importation of iguanas, the prosecutor repeatedly asked inappropriate and prejudicial questions of witnesses, eliciting testimony about occasional marijuana use and even placing a witnesses' "sexual character" into question in front of the jury. Id. at 1102. Such inappropriate, egregious questioning is incomparable to the line of questioning at issue here, where appellant had a good-faith basis to inquire into facts that bear on Mr. Mitchell's credibility.

3

Similarly, defense had a more than sufficient basis to inquire into Mr. Mitchell's history. The allegations contained in a prior DeKalb County lawsuit against Mr. Mitchell went directly to his character for truthfulness under F.R.E. 608(b). As stated in appellant's initial brief, the district court's holding in the alternative was an abuse of discretion. Defense did not seek to question Mr. Mitchell about the lawsuit in order to show propensity for committing fraud – rather, the allegations in that lawsuit go directly to Mr. Mitchell's character for truthfulness under Rule 608(b). In U.S. v. Taylor, 417 F.3d 1176, (2005), the defendant attempted to admit 13 complaints of police misconduct against a testifying officer to prove that he was biased and had a tendency for untruthfulness. This Court held that the district court rightly denied defense's attempt to admit the aforementioned complaints because they were unfounded. Such was not the case in Ms. Bickers' case, where defense sought to cross examine Mr. Mitchell on a heavily litigated lawsuit to which Mr. Mitchell was a party – rather than a mere complaint or accusation.

Lastly, the district court's finding that there was "nothing inherently untruthful" about Mr. Mitchell's behavior during his divorce – opening accounts in other peoples' names and placing money from one business into different business or personal accounts – is patently wrong. Doc. 193, p. 19. In this case, the government relied heavily on allegations of moving money through multiple bank

4

accounts and opening accounts in other peoples' names to prosecute Ms. Bickers –
distinctly similar to the very behavior alleged in Mr. Mitchell's divorce
proceedings.

### B.    Ms. Bickers' Sixth Amendment Rights Were Violated and She Was Not Allowed a Thorough Cross Examination.

The above-enumerated errors deprived Ms. Bickers of her Sixth Amendment
right to a thorough cross examination, and a jury would have received a
significantly different impression of witness credibility (and ultimately, the
defendant's guilt) had defense been able to pursue the line of questioning. See U.S.
v. Garcia, 13 F.3d 1464, 1469 (11th Cir. 1994). "[T]o prohibit cross examination of
a prosecution witness on relevant evidence of bias and motive may violate the
Confrontation Clause, if the jury is precluded from hearing evidence from which it
could appropriately draw adverse inferences on the witness's credibility."
Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986).

Still, the government relies on Van Arsdall in asserting that any error was
harmless. Id. In Delaware v. Van Arsdall, the trial court barred defense from cross-
examining the prosecution's witness as to the fact that an unrelated criminal charge
against him had been dismissed after he agreed to speak with the prosecution, as
well as his cooperation with police in "an unrelated homicide that had occurred

after" the relevant murder. Id. The Supreme Court found "by thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the confrontation clause." Id. at 680. Moreover, it found that "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination." Id.

In Ms. Bickers case, Mr. Mitchell was the government's key witness, as without him, there would be scant direct evidence linking Ms. Bickers to the alleged conspiracy. As such, Mr. Mitchell's credibility was essential to the jury's consideration of the evidence. Despite the court's being well aware of Mr. Mitchell's status within the government's case, the district court barred defense from questioning Mr. Mitchell on the following facts: (1) the FBI's agreement to pay him for his cooperation, (2) allegations of fraud concerning DeKalb County Schools, and (3) allegations that Mr. Mitchell opened multiple business and bank accounts in other peoples' names. All of these facts would have allowed the jury to "draw adverse inferences" on Mr. Mitchell's credibility – far beyond that which they may have gleaned from the limited testimony they heard.

6

## II.    The District Court Abused Its Discretion When It Denied Defendant's Motion for a Curative Instruction After the Government's Witness Gave False Testimony Which the Government Knew to Be False.

As stated in Appellant's principal brief, the government violates a defendant's Due Process rights when it fails to correct a witness' false testimony. Napue v. Illinois, 360 U.S. 264, 269 (1959); Giglio v. United States, 405 U.S. 150, 153 (1972). Mr. Mitchell gave testimony which the government knew to be untrue on numerous occasions and the government failed to correct it. Accordingly, the district court erred in denying Ms. Bickers' motion for a curative instruction.

### A.    Mitchell Gave Patently False Testimony

The Government contends that Mitchell merely had a faulty memory, and thus no Napue violation occurred. Doc. 29, p. 36. While a witnesses' "not sure" and "don't know" may not establish falsity, Mr. Mitchell did not give such answers – he patently denied facts which were belied by the evidence, and which the government knew to be facts. Routly v. Singletary, 33 F. 3d 1279, 1286 (11th Cir. 1994).

Defense asked Mr. Mitchell if he remembered that, as a cooperator, he could "break the law, as long as [he] broke the law working with [the FBI]." In response, Mr. Mitchell stated: "No, that was not my understanding." Doc. 245,

102-103. Such a statement is not evidence of a memory failure, it is an affirmative denial.   When asked whether every three months the FBI would meet with him and review his obligations as a cooperator, Mr. Mitchell responded plainly, "that did not happen." Doc. 245, 103. Again, this is not "evidence [of] Mitchell's faulty memory," as the government contends – this is a false statement. Doc. 29, p. 37.

Appellant relies on facts contained in the FBI file to evidence Mr. Mitchell's false testimony.  The facts contained within the FBI file are not prior inconsistent statements, as they were not statements made by the witness. In its brief, the government relies solely on cases where witnesses gave testimony conflicting with his own earlier statement or conflicting with other witnesses' testimony. U.S. v. Stein, 846 F.3d 1135 (11th Cir. 2017); U.S. v. Michael, 17 F.3d 1383 (11th Cir. 1994). Such is not the case here. Mr. Mitchell's false testimony was not contradicted by his own earlier statements, but by facts which existed on the record, in the FBI file – facts which the government knew to be true. The FBI file contains volumes of reports written by FBI agents, affirming that such events occurred.

## B.    Mitchell's False Testimony Was Material to the Verdict

Mr. Mitchell's false testimony, uncorrected by the government who knew it to be false, impacted the minds of jurors. If the "thrust of Giglio and its progeny has

8

been to ensure that the jury know the facts that might motivate a witness in giving testimony," then Giglio was not satisfied here, where the jurors were not privy to the details of Mr. Mitchell's cooperation with the FBI, nor his other acts of dishonesty regarding Dekalb County schools and his bank accounts. Doc. 29, p. 54 (quoting Ventura v. Attorney General, Fla, 419 F.3d 1269, 1282 (11th Cir. 2005).

Ventura illuminates the uniquely high bar the government is required to overcome to establish materiality in a case like this. 419 F.3d 1269 (11th Cir. 2005). This Court re-emphasized the holding in U.S. v. Agurs, 427 U.S. 97, 103 (1976): "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside *if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.*" Id. at 1278. Then, this Court went further: "[t]he 'any reasonable likelihood' standard differs from the materiality standard applicable to other types of Brady violations because of the nature of the error." Id. Moreover, "the Court has applied a strict standard of materiality [to Giglio violations], not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." Id. (quoting Agurs, 427 U.S. at 104).

Here, the government has failed to meet the strict materiality standard set forth by this Court and the United State Supreme Court. The witness, Mr. Mitchell gave patently false testimony which was directly controverted by the evidence in the

9

FBI file, and the government made no attempt to correct the false testimony. Had the facts been revealed to the jury, the outcome of the case would have been different. As such, the district court erred in denying defense's motion for a curative instruction, and necessitates reversal on the conviction.

### III.    The District Court Abused Its Discretion and Committed Reversible Error in Admitting Ms. Alexander's Statements and Denying Defendant's Motion for Mistrial on the Issue.

#### A.    The United States Caused Alexander's Unavailability

The government cites inapt caselaw to suggest that the United States did not cause Ms. Alexander to become an unavailable witness. In Demps v. Wainwright, 805 F. 2d 1426, 1433 (11th Cir. 1986), an incarcerated witness was induced by a prison official into testifying against the defendant. The witness even testified at an evidentiary hearing before the Court that he was not a witness to the underlying homicide, but that a prison investigator induced him to testify by offering him a transfer to a different correctional facility and a chance at parole. Id. at 1434. The facts in Demps are significantly distinct from the facts at issue here, where a witness who was available to testify changed her mind *after* the government alleged incriminating facts against her in its opening statements.

10

The government similarly cites to U.S. v. Serrano, 460 F. 3d 1208, 1216 (10th Cir. 2005). In that case, the Tenth Circuit held: "[t]he dispositive question in each case is whether the government's interference with a witness's decision to testify was 'substantial.'" Id. (citing U.S. v. Crawford, 707 F. 2d 447, 449 (10th Cir. 1983)) Interference is deemed substantial when "the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." Id. In Serrano, the district court judge and the prosecutor encouraged a witness to consult with an attorney before deciding to testify. Such is not the case here, where Ms. Alexander had consulted with an attorney well before trial, and appeared on the first day of trial prepared to testify under defense's subpoena. As stated in appellant's principle brief, it was only after the government's opening statements publicly named Ms. Alexander as an acceptor of bribes within the City of Atlanta, and after, as a result, Ms. Alexander was suspended from her job due to the public allegations which were repeated within hours through the news media, that Ms. Alexander decided not to testify. The decision was a direct result of the government's allegations in its opening statements – statements which were, undeniably, an effective act of intimidation.

Contrary to the timeline alleged in the government's brief, Ms. Alexander's attorney testified that he first put the government on notice that Ms. Alexander would assert her fifth amendment privilege on March 11, 2022. Tr. 1320-21. That

11

was two days after the trial began, and after the government gave its opening statement. The record reflects that Ms. Alexander's attorney contacted the government on March 8, 2022 only to inquire about the witness subpoena, which he mistakenly believed to be from the government.

### B.    Alexander's Emails Constituted Hearsay

The government contends that its Exhibits 101 and 102 are "orders" and "are not even capable of being true or false." Doc. 29, p. 43; U.S. v. Perry, 14 F. 4th 1253, 1274 (11th Cir. 2021). At trial, the documents were introduced exactly for that reason – to question the witness, Ms. Braswell, as to the veracity of the orders. For example, when the government introduced Exhibit 102, which was an email from Ms. Alexander to Mr. Mitchell, the government questioned the witness as to the price for salt described in the order. Tr. 799. AUSA Kitchens painstakingly had the witness read both emails – which the witness was only copied on – in order to compare the prices of salt given to Mr. Wynn (in Exhibit 101) versus to Mr. Mitchell (in Exhibit 102). In order to compare the two prices, one must verify that the information in the email (i.e., the prices described) are, in fact, true and accurate.

Additionally, the government contends that Exhibits 101 and 102 were introduced for their effect on the listener, and, thus, are not hearsay. But no follow-

12

up questions were asked of this witness – who again, was not a speaker in this email but was merely copied – regarding the effect the emails had on her. Instead, the government asked Ms. Braswell why she thought Ms. Alexander, the author of the emails, would have ordered from two different companies with different prices. Tr. 803-806. Ms. Braswell could not answer these questions because she was not the author of the emails and she was not responsible for the difference in prices. In short, there was no impact on the listener, Ms. Braswell, and she took no specific action in response to the two "orders" which she was copied on. The emails were introduced to illustrate the price disparity between Mr. Wynn and Mr. Mitchell's respective orders, not to illustrate Ms. Braswell's actions as a result thereof.

Had the government called the proper witness to testify to the emails – i.e., Ms. Alexander, who was the author of the emails – the entire trial would have been different. Instead, the government utilized Ms. Alexander's convenient absence, to implicitly place culpability on her, without ever having to cross examine her on her role in the scheme.  In the wake of Ms. Alexander's absence, only Ms. Bickers was left for the government to blame.

## IV.    <u>Remand and Dismissal of the Four Wire Fraud Counts is Insufficient To Remedy the Harm At Issue Here.</u>

Due to post-trial developments in the law, the government now asks this Court to remand to the district court so it may dismiss the four wire-fraud counts against Ms. Bickers. Accordingly, the government also asks for a "limited re-sentencing" in light of the dismissed wire-fraud convictions. Doc. 29, p. 46. However, the government's proposed limited remedy is insufficient to remediate the damage which was done in this case, based on the improper wire fraud counts. The case should be reversed and remanded to the district court for a new trial.

Ms. Bickers was charged and convicted on four counts of wire fraud (Counts 7-10 of the indictment) and sentenced to 168 months on those counts. The topic of wire fraud was so intrinsic and so infected the entirety of the trial that it cannot be excised post-conviction. The pervasive and continuous testimony and argument as to Ms. Bickers' wire fraud tainted the entire trial, and it must be redone.

## A.    The Indictment

The Indictment against Ms. Bickers focused heavily on the facts underlying the wire fraud counts, even in sections which set forth other violations of law. Doc. 41. In Count One, which alleged Conspiracy to Commit Bribery, the indictment set forth multiple sections dedicated to Ms. Bickers' employment with the City of Atlanta, and the money she received as a result. Under the "Overt Acts" section, the indictment detailed Ms. Bickers' Financial Disclosure Statements in 2011, 2012, 2013, and 2014. Doc. 41, pp. 7-10. In a subsequent section, under the Wire

14

Fraud Counts 7 through 10, the indictment detailed Ms. Bickers' alleged ethical violations in her financial disclosure forms, specifically citing her City of Atlanta salary payments. Doc. 41, pp. 22-23. The acts were not separate and distinct from the acts which supported allegations of Bribery, Conspiracy, and other offenses – instead, they were part and parcel to the entire "scheme" laid out by the government which allowed Ms. Bickers to commit bribery, fraud, and other acts of dishonesty. From this early stage of the case, the acts underlying wire fraud were intrinsic to the entire case.

### B.    The Trial

Within minutes of beginning its opening statements to the jury, the government argued that Ms. Bickers was dishonest on her financial disclosure statements – a failure which, according to the government, would have gotten her fired. Doc. 240, pp. 236-37. ("And based on those false statements, that's why the City of Atlanta continued to pay her salary and those salary payments are the basis for the four wire fraud counts"). Over the course of the trial, which lasted 9 days, the government called witnesses almost every day who testified to Ms. Bickers' job with the city of Atlanta and her financial disclosure statements. On day one, the government called Danielle Nichols, City of Atlanta's Deputy Commissioner of Human Resources, who spoke to Ms. Bickers' role within the City of Atlanta and the circumstances surrounding her eventual "leave without pay." Doc. 240, pp.

15

290-296. Nina Hickson, the former City of Atlanta Ethics Officer, testified to the City of Atlanta ethics code and financial disclosure forms. Doc. 240, pp. 299-322. Jonathan Keen testified that if a City of Atlanta employee failed to disclose outside income, they would be terminated. Doc. 241, pp. 580-582. Sabrina Black, the City of Atlanta's former payroll supervisor, verified that Ms. Bickers was paid by the City of Atlanta for her job (the income which was the subject of the wire fraud counts). Doc. 241, pp. 607-.609. Richard Leary, from Wells Fargo, testified to the automatic routing of funds from the City of Atlanta to its employees, including Ms. Bickers. Doc. 243, pp. 966-970. Lisa Reed, Ms. Bickers' tax preparer, testified that she prepared Ms. Bickers' taxes, which did not include outside income from her other businesses. Id., pp. 1029- 1079. Ms. Reed also testified to a tense exchange at City Hall between Ms. Bickers and Cotena Alexander, the unavailable witness. Id. pp. 1072, 1078. Tammy Willingham, an internal revenue agent, also testified to Ms. Bickers sources of income. Doc. 204, pp. 1116-1141.

All witnesses who testified to the facts underlying wire fraud simultaneously testified  to facts supporting other charges against Ms. Bickers, including bribery, conspiracy, and falsifying tax returns, making the issues and facts of the case intertwined and inseparable. The wire fraud counts rested on Ms. Bickers' financial disclosure with the City of Atlanta – but those allegations also went directly to Ms. Bickers credibility and truthfulness. If the jury found that she likely committed

fraud, it is easier for a jury to find that she is more likely to commit other acts of dishonesty. The error of allowing the wire fraud counts to stand went far beyond a wrongful conviction – it inserted allegations of fraud into the case, which ultimately led to Ms. Bickers' conviction.

Proper dismissal of the wire fraud counts and exclusion of all testimony related thereto was crucial to the defense in this case, and the district court's failure to dismiss the counts at the outset of the case constitutes reversible error. See U.S. v. Grajales, 450 Fed. Appx. 893 (11th Cir. 2012). The inclusion of the wire fraud counts, and the subsequent flood of prejudicial testimony which stemmed therefrom, necessitates that this case be remanded to the district court and re-tried accordingly. See U.S. v. Reddy, 534 Fed. Appx. 866 (11th Cir. 2013).

## V.    The District Court Erred in Applying the Sentencing Guidelines

### A.    Relevant Conduct

The government failed at sentencing, and now fails in its reply brief, to meet its burden in showing that the "relevant conduct" was in fact "substantially connected to each other by at least one common factor". Doc. 29, p. 48 (citing U.S.S.G. § 1B1.3 cmt. N.5(B)(i). Such common factors were never shown at sentencing as to each transaction in Ms. Bickers' bank account. Moreover, it is impossible to say that the transactions in Ms. Bickers' bank account reflect shared common accomplices

17

because it is unclear whether the money in that account even comes from those accomplices or somewhere innocuous. At sentencing, the government did not parse out specific transactions – it included Ms. Bickers' bank account as a whole and never made any showing as to how individual transactions may share "common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3 cmt. N.5(B)(i). Instead, it relied on assumption, seemingly suggesting – *if Ms. Bickers used this bank account to commit fraud, then every dollar in it must be the result of fraud.* The assertion is illogical and illegal, and the government has failed to meet its burden.

### B.    The Loss Amount

Secondly, the government failed at sentencing to meet its burden in calculating the loss amount. The government contends that courts "need only make a reasonable estimate of the loss, given the available information," but the court in this case did not make a reasonable estimate, despite having all the information necessary. U.S. v. Whitman, 887 F.3d 1240, 1248 (11th Cir. 2018).

The government cites U.S. v. Campbell, 765 F. 3d 1291 (11th Cir. 2014) to establish it needs not "sift through years of bank records and receipts to ascertain itemized proof of every single transaction that should be chalked up as a loss." However, the primary holding in Campbell was that Courts should look to the total

amount that the state lost as opposed to the amount the defendant gained in order to determine loss amount. Id. at 1299 (holding that the Court should look to the defendant's gain only when the loss cannot be reasonably determined). In Ms. Bickers' case, the government and the Court looked solely at Ms. Bickers' gain, even though the loss to the government is clearly ascertainable. Moreover, the Court in Campbell looked to the findings of the jury as a factor in determining loss amount. Id. at 1303. Accordingly, because the jury found Ms. Bickers not guilty on Counts 2 and 3 (which alleged conspiracy to commit bribery and bribery related to business dealings in Jackson, Mississippi from 2013 to 2015), transactions from that time period cannot be applied to the total loss amount, as they were here, and any other transactions can be and should be specifically ascertained, rather than generalized.

### C.    "High-Level Decision-Making"

In its reply brief, the government cites a Sixth Circuit case where the Court held that the person's authority need not be used to affect the offense. U.S. v. Hills, 27 F. 4th 1155, 1194 (6th Cir. 2022). The government cites no supporting caselaw from this circuit. Even then, the facts in Hills are substantially different than the case at bar. In Hills, the defendant was the "long-serving chair of the Dental Department" at a local hospital, and was charged with executing various fraudulent schemes which all related directly to dentistry: a dental resident bribery scheme, an "Oral Health Enrichment" scheme, and a patient referral kickback scheme, and

19

other schemes related specifically to dental patients. U.S. v. Hills, 27 F. 4th 1155, 1194 (6th Cir. 2022). The Court had no trouble finding that his position was "characterized by a direct authority to make decisions for, on behalf of, a government department . . . or by a substantial influence over the decision-making process." U.S. v. Hills, 27 F. 4th 1155, 1194 (6th Cir. 2022) (citing U.S.S.G. § 2C1.1(b)(3)). Such is not the case here, where Ms. Bickers' "position of authority" was in the department of Human Services, where she oversaw programs such as homeless outreach, and had no role in awarding city contracts. Accordingly, the district court erred in applying the four-level enhancement under § 2C1.1(b)(3).

### D.    An "Otherwise Extensive" Scheme

In U.S. v. Slaughter, 298 F. App'x 876, 877 (11th Cir. 2008), the Court applied the four-level enhancement where there were less than five participants, but the scheme itself involved "many knowing and unknowing individuals in [the] criminal activity." The facts in Ms. Bickers' case do not reveal "many" knowing and unknowing people involved. The record indicates a possible conspiracy of three people, and, at best, one other person in the City of Atlanta. Moreover, the process of one co-conspirator paying another, him taking a cut, and then paying the other co-conspirator with what's left does not constitute "complex transactions," as the government contends. Doc. 29, p. 55. What the government calls 'numerous companies" is really three different companies operated by two people.

Additionally, the government cite to <u>U.S. v. Gupta</u>, 463 F. 3d 1182, 1198 (11th Cir. 2006), where the Court categorized the defendant's scheme as "extensive criminal activity, as it involved seven corporations, numerous straw owners, Medicare reimbursement of over $ 15 million, and repeated failure to disclose related party status over a seven-year period." The scheme in <u>Gupta</u> was far more complex and far-reaching than the scheme at issue here, and as such, is not instructive or controlling here.

While the government suggests that Ms. Bickers "came up with the scheme" and "found knowing participants," it does not cite to any place in the transcript where such testimony was elicited, because those facts were never revealed at trial. Doc. 29, p. 73. What was revealed at trial was that Richards' entire understanding of the scheme came from Mitchell, not Bickers, Doc. 240, pp. 382-85, and Richards had only one direct wire transfer to Bickers, Doc. 240, pp. 368, 375-76 – both facts supporting the idea that Mitchell, not Bickers, held control over the stream of information and communication between the co-conspirators, and ultimately, called the shots.

**CONCLUSION**

Appellant Bickers respectfully requests that this Court reverse on all grounds and remand the case back to the District Court for a new trial. As the four wire

21

fraud counts at issue were intrinsic to the case, the pervasive evidence of dishonesty supporting the four wire fraud counts tainted the jury's findings as to all other counts and the case should be retried.  In the alternative, if the case is not remanded for new trial, Ms. Bickers respectfully requests that she be re-sentenced in light of the dismissed counts and the errors in sentencing which occurred in the district court.

## CERTIFICATE OF COMPLIANCE AND SERVICE

Appellant certifies that pursuant to Federal Rules of Appellate Procedure and 32(a)(5) and (6) that the style and size of the font used in this brief is Times New Roman, 14-point.

This brief complies with the 13,000 word type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word processing software, it contains 5,900 words.

Today, this brief was uploaded to the Court's website and served on opposing parties using the CM/ECF system, which automatically sends notification to the parties of record, namely:

Assistant United States Attorney Jeffrey W. Davis

Assistant United States Attorney Tiffany Dillingham

This 14th day of August, 2023,

/s/ Drew Findling
Drew Findling
Georgia Bar No. 260425

23